```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3      Nicopure Labs, LLC, et al.,     ) Civil Action
                                        ) No. 16-CV-878
 4                    Plaintiffs,       )
                                        ) MOTIONS HEARING
 5      vs.                             )
                                        ) Washington, DC
 6      Food and Drug Administration,   ) October 11, 2016
        et al.,                         ) Time:  10:15 A.M.
 7                                      )
                      Defendants        )
 8      _____

 9                 TRANSCRIPT OF MOTIONS HEARING
                          HELD BEFORE
10          THE HONORABLE JUDGE AMY BERMAN JACKSON
                  UNITED STATES DISTRICT JUDGE
11      _____

12                   A P P E A R A N C E S

13      For the Plaintiffs:
           Nicopure Labs, LLC          Benjamin Conrad Block
14                                      Kevin F. King
                                        COVINGTON & BURLING LLP
15                                      One City Center
                                        850 Tenth Street, NW
16                                      Suite 326N
                                        Washington, DC 20001
17                                      (202) 662-5205

           Right to be Smoke-Free
18            Coalition                 Eric P. Gotting
                                        Azim Chowdhury
19                                      KELLER & HECKMAN, LLP
                                        1001 G Street, NW
20                                      Suite 500 West
                                        Washington, DC 20001
21                                      (202) 434-4269

22      For the Defendants:            Eric B. Beckenhauer
                                        Sheila Lieber
23                                      Amy Brown
                                        Stuart Robinson
24                                      U.S. DEPARTMENT OF JUSTICE
                                        Federal Programs Branch
25                                      20 Massachusetts Avenue, NW
                                        Washington, DC 20530
```

1

2      Court Reporter:              Janice E. Dickman, RMR, CRR
                                    Official Court Reporter
3                                   United States Courthouse, Room 6523
                                    333 Constitution Avenue, NW
4                                   Washington, DC  20001
                                    202-354-3267

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURTROOM DEPUTY:  Your Honor, calling civil

2    action number 16-878, Nicopure Labs, LLC, et al. versus the

3    Food and Drug Administration, et al.  Will arguing counsel

4    please approach the lectern, identify yourself and your

5    colleagues for the record, and the party or parties that you

6    represent.

7    MR. BLOCK:  Good morning, Your Honor.  Benjamin

8    Block of Covington and Burling, LLP, on behalf of Nicopure

9    Labs, LLC.  I'm joined at counsel table by my colleague

10   Kevin King.

11   THE COURT:  All right.  Good morning.  I was about

12   to ask you if counsel for the other plaintiffs was going to

13   argue, but he's going to stand up and introduce himself.

14   MR. GOTTING:  I'm Eric Gotting, I'm with Keller

15   and Heckman here in Washington, D.C. and I represent the

16   Right to be Smoke-Free Coalition, as well as the other trade

17   associations.  And I have Azim Chowdhury with me and our

18   paralegal Kimberly Sparks.

19   THE COURT:  All right.  Good morning.

20   MR. BECKENHAUER:  Good morning, Your Honor.  Eric

21   Beckenhauer from the Department of Justice on behalf of

22   defendants.  With me at counsel table are Sheila Lieber, Amy

23   Brown, and Stuart Robinson also from the Department of

24   Justice, and Wendy Vicente from the FDA.

25   THE COURT:  All right.  On May 10, 2016 the FDA

1     published its final rule deeming electronic cigarettes and

2     other vaping devices to be to be tobacco products, subject

3     to regulation under the Family Smoking Prevention and

4     Tobacco Control Act.  In an electronic cigarette you have an

5     atomizer with a heating element that heats liquid which

6     creates a vapor that the user inhales through a mouthpiece.

7     The device includes a battery that makes the heating element

8     work.

9          Two sets of plaintiffs in this case, first,

10    Nicopure Labs, a company that manufactures the liquid that's

11    utilized in certain electronic vaping systems, which, as it

12    says, often includes nicotine.  And second, a number of

13    trade associations, led by the Right to be Smoke-Free

14    Coalition, whose members also either manufacture the liquid

15    or sell what the plaintiffs refer to as ENDS, electronic

16    nicotine deliver systems.  And according to these plaintiffs,

17    nicotine is used in most, but not all, e-liquids.

18         These plaintiffs have challenged numerous aspects

19    of the rule under the Administrative Procedure Act and the

20    Constitution.  In particular, the First Amendment.  I think

21    it's important to state from the outset that notwithstanding

22    the outcry that has greeted the government's action and the

23    e-mail and phone calls I've received in chambers, this case

24    is not about whether the FDA has the right to ban or

25    eliminate e-cigarettes or vaping.  Just like the Tobacco

1   Control Act regulates but does not prohibit the manufacture

2   or sale of cigarettes and other tobacco products to adults,

3   the FDA's exercise of its statutory authority to deem

4   e-cigarettes to be a tobacco product, subject to the very

5   same regimen under the Tobacco Control Act, does not

6   prohibit their manufacture or sale to adults.

7          And while plaintiffs are challenging the FDA's new

8   rule, much of what they object to in this case is

9   statutorily mandated by the Tobacco Control Act because if

10  e-cigarettes are, quote, unquote, tobacco products, the Act

11  requires that all tobacco products be subject to certain

12  restrictions.

13         But the plaintiffs claim that the FTA went further

14  than the Tobacco Control Act legally permits to go when it

15  issued the rule deeming e-cigarettes to be tobacco products,

16  and that the decision to deem in the first place was all

17  arbitrary and capricious under the ABA for a number of

18  reasons, including because, in plaintiffs' view, the costs

19  to them outweigh the benefits to the public.

20         There are multiple aspects of challenge to the

21  regulation being brought here.  And so I think the most

22  efficient way to manage the hearing will be to hear from

23  each side on each issue, rather than hearing from one side

24  on all the issues and then expecting the other side to

25  respond to them all.  Also, we have cross motions for

1    summary judgment here, so if we follow the usual procedure

2    of the moving party goes last, we'll never go home.  So

3    we're not going to do that.

4          So with respect to each issue, I'm going to let

5    the people challenging the rule go first, then we'll hear

6    from the FDA, then we'll go on to the next issue.  I want to

7    warn you at the outset, if you've had hearings before me,

8    this isn't going to come as a big surprise to you, I have

9    many questions, they are pointed questions.  But don't

10   assume from the questions that I've made up my mind.  These

11   are just the questions that I want to ask.  And don't panic

12   if you don't get to say everything you have written down on

13   the pieces of paper that you have worked very hard on before

14   this morning.  I promise you that I will do what I do in

15   every hearing, and at the end give you an opportunity to

16   make any points that you feel you've been unable to make

17   while you've been dealing with the barrage from me.

18         So before I get to the challenge to the

19   reasonableness and the constitutionality of the Rule, I want

20   to start with Nicopure's first argument, that the FDA

21   exceeded its statutory authority when it deemed certainly

22   e-cigarettes and vaping products to be tobacco products.

23         In the Tobacco Control Act passed in 2009,

24   Congress said, in § 387a, tobacco products shall be

25   regulated by the secretary, and that that subchapter applies

1      to all cigarettes, cigarette tobacco, roll-your-own tobacco,

2      smokeless tobacco and to any other tobacco products that the

3      secretary, by regulation, deems to be subject to this

4      subchapter.  The statute defines a tobacco products as any

5      product made or derived from tobacco, including any

6      component part or accessory of a tobacco product.  That's 21

7      U.S. Code § 321(rr)(1).

8              That is the definition.  Notwithstanding the

9      number of times Nicopure coded the definition in its brief

10     as any product made or derived from tobacco dot, dot, dot,

11     or, worse, made or derived from tobacco period, and then

12     argued in the brief and in the reply that e-cigarettes

13     weren't, quote, derived from tobacco.  That kind of

14     selective quotation is very frustrating to the reader and,

15     frankly, it perplexes me as a strategy since it undercuts

16     the focus and the force of the serious arguments the

17     plaintiffs have to make.  If you continually cite the statue

18     but you leave out the part that the government is relying

19     on, you're not getting yourself anywhere.

20             But let's start with the statutory argument

21     because the first thing I need to do, notwithstanding the

22     length of all the briefs, is to spend some time nailing down

23     exactly what is being challenged here and what is not.  So

24     whoever is going to argue this issue for the plaintiff

25     should come up.

1              I really am, actually, not going to let you get a

2      word out, I'm just going to just start with the questions.

3      And don't take it personally, it's happened to many people

4      in this courtroom.

5              As we talked about before, in an electronic

6      cigarette there's a liquid, there's an atomizer with a

7      heating element that heats the liquid and creates the vapor,

8      and a battery that makes the heating element work.  As the

9      government explains, approximately two-thirds of the

10     e-cigarettes on the market are what they call cig-alikes

11     that are manufactured by the large cigarette manufacturers;

12     they resemble a cigarette and, like a cigarette, you can

13     only use them once.  But it's the closest to them, it has

14     all those components just described.

15             Now, my question to you is:  You're not

16     challenging whether the FDA has the legal authority to

17     regulate those, is that correct?

18             MR. BLOCK:  That's correct, Your Honor.  Where the

19     liquid is part of the -- the liquid that contains the

20     nicotine is part of the product being sold, that's correct.

21             THE COURT:  It's all one.  Not even a cartridge --

22             MR. BLOCK:  That's correct.

23             THE COURT:  -- it's the one that -- I don't think

24     you addressed this, but the FDA says in its brief it's

25     two-thirds of the e-cigarettes on the market, and Right to

1    be Smoke-Free Coalition hasn't challenged the statutory

2    authority to regulate those either, is that right?

3             MR. GOTTING:  We have joined their brief, but I'm

4    not prepared to talk about this.  He's going to address that.

5             THE COURT:  All right.  So do you agree that the

6    all-in-one electronic cigarette is a tobacco product?

7             MR. BLOCK:  Yes, Your Honor.

8             THE COURT:  And so, therefore, its components are

9    tobacco products?

10             MR. BLOCK:  Well, it -- it's one product.  I don't

11    think the components are sold separately.  So, I'm sorry,

12    I'm perhaps not understanding your question.

13             THE COURT:  A component of a tobacco product is a

14    tobacco product.  So there's a battery in there.  So,

15    presumably, if you say it can only -- the government could

16    say, since this whole thing is a tobacco product, the

17    battery in your tobacco product has to meet the following

18    specifications?

19             MR. BLOCK:  Yes.  That's right, Your Honor.

20             THE COURT:  So then the final third of the market

21    is what we're talking about in this case, which are the

22    vaping systems.  But there are two kinds of those, there's

23    the closed ones that utilize liquid but it comes in a

24    cartridge and you have to add one, a new one every time you

25    use it.  So it's not like the e-cigarettes that we just

1    talked about.  But you're also not challenging whether the

2    FDA has the authority to regulate the closed cartridge

3    systems either, is that correct?

4              MR. BLOCK:  The closed cartridge system where the

5    liquid in the system is nicotine that's derived from

6    tobacco, that's correct, Your Honor.

7              THE COURT:  All right.  Well, there were several

8    caveats in there.  If you put a cartridge in there and the

9    nicotine is derived from somewhere else, you're saying the

10   government doesn't have the authority to regulate those?

11             MR. BLOCK:  That would be correct, Your Honor.

12   Because it has to -- to be a tobacco product it has to be a

13   product that is made or derived from tobacco, as Your Honor

14   points out, as I think we did cite in our brief -- I know we

15   cited in our brief, including a component part or accessory

16   of a tobacco product.

17             But, as FDA said in its report to Congress, I

18   think FDA had it right there, the question is what's the

19   product made from?  Where does it come from?  And so it has

20   to have --

21             THE COURT:  But I didn't see anywhere in your

22   brief where you were objecting to closed -- the ability to

23   regulate closed systems, the statutory.  I mean, you may

24   have gotten into it in the APA section, but the statutory

25   ability to regulate closed systems, I didn't -- is that in

1   your brief or that not in your brief?

2            MR. BLOCK:  Well, I'm sorry, Your Honor.  We're

3   not -- Nicopure does not manufacture closed systems that

4   don't -- that are -- I'm sorry, too many negatives.  We do

5   not make closed systems that have something in it other than

6   nicotine that's derived from tobacco.  So my point is just

7   that if someone else out there made something like that,

8   they would have an argument that FDA doesn't regulate.

9            THE COURT:  Okay.  But that's not subject to

10   challenge in this case at this moment?

11            MR. BLOCK:  I -- I'm sorry, Your Honor.  I

12   guess -- I guess that's correct, Your Honor.  Our argument

13   is statutorily FDA does not have the authority to regulate

14   products that are neither made nor derived from tobacco.

15   The example you gave would be such a product.  So if they

16   were extending their regulatory control over it, that the

17   rule goes too far.  But I think that's -- it's a natural

18   consequence of whatever Your Honor rules with respect to the

19   challenge we're making based on our products.

20            THE COURT:  But your brief is about open systems,

21   is that right?

22            MR. BLOCK:  Yes.  That's correct, Your Honor.

23            THE COURT:  And the cartridge, closed systems with

24   the cartridge were what was involved in the *Sottera* case,

25   isn't that right?

1          MR. BLOCK:  The *Sottera* case involved a closed

2     system with cartridges, I believe.  That's correct, Your

3     Honor.

4          THE COURT:  So what portion of this third of the

5     market that are not the all-in-one cigarettes are the

6     cartridge systems and what portion is the open systems?

7          MR. BLOCK:  I don't know that I have that answer,

8     Your Honor.  The open -- the -- for Nicopure, the open

9     systems -- and it's not a -- I think by terminology it's not

10    a cartridge, it's a tank that can be -- you can pour the

11    liquid into it.

12         THE COURT:  That's the open system.  It's a

13    refillable tank.

14         MR. BLOCK:  That's the open system.  Those are

15    Nicopure's most popular products.

16         THE COURT:  Right.  I was trying to figure out,

17    we've got two-thirds of the market are e-cigarettes that are

18    all in one, you use them once and you throw them out.  A

19    third are the systems that either are like a cartridge pen

20    where you put in a cartridge of liquid or like a fountain

21    pen where you have a refillable tank and you fill it up with

22    liquid each time.  But you don't know what portion of that

23    third is --

24         MR. BLOCK:  I don't know which is which.  And I

25    think the market is evolving, Your Honor.

1          THE COURT:  Okay.  And it is the open systems for

2     which you argue that the deeming was unlawful under the Act,

3     is that correct?

4          MR. BLOCK:  That is correct, Your Honor.

5          THE COURT:  Now, is the FDA correct when it says --

6     putting aside your APA challenge, just the statutory

7     challenge -- that you're not even challenging the FDA's

8     statutory authority to regulate all open systems, only the

9     open systems when somebody puts in a liquid that does not

10    contain nicotine?

11         MR. BLOCK:  No, I don't think that's -- I don't

12    think that's correct, Your Honor.  Which portion of the

13    FDA's brief are you alluding to?

14         THE COURT:  Well, that's what they said.  So why

15    don't you just tell me.  Are you challenging the FDA's

16    statutory ability to deem all open system e-cigarettes to be

17    tobacco products, or are you only challenging their

18    statutory ability to do it if somebody fills the tank with a

19    liquid that does not contain nicotine?

20         MR. BLOCK:  The former, Your Honor.  An open

21    system, an open system electronic cigarette, or open system

22    vaping device is what we would call them, is neither made

23    nor derived from tobacco, nor intended for human

24    consumption.  It meets none of those necessary criteria to

25    be a tobacco product under the definition that Congress put

1    in the Tobacco Control Act.  The -- an e-liquid that

2    contained nicotine that was derived from tobacco, we agree

3    would be a tobacco product under the Congressional

4    definition and subject to lawful regulation by FDA.

5              THE COURT:  So they can regulate all the liquids

6    that are going to go into the open system, but they can't

7    regulate the thing, the container, essentially, that --

8              MR. BLOCK:  Well, if I may, Your Honor.  Sorry.

9    They cannot -- they can regulate all of the liquids that

10   contain nicotine derived from tobacco.  There are and we

11   make, Nicopure makes e-liquids that have no nicotine in

12   them, no tobacco in them.  Those are not tobacco products

13   subject to regulation by FDA.  But the rule says FDA thinks

14   it can regulate and deem those.  So that's the second part

15   of our challenge.

16             THE COURT:  When you said in your reply an open

17   system vaping device, at least when sold without a

18   nicotine-containing e-liquid, is neither made nor derived

19   from tobacco, so is it made or derived from tobacco or a

20   component of something if it is sold with a nicotine-

21   containing e-liquid?

22             MR. BLOCK:  If it's sold in a kit with a nicotine

23   containing liquid, then that kit or that product that's

24   being sold would, FDA argues and we're not challenging,

25   would meet the definition of tobacco product because the

1   product's got -- includes the e-liquids that's got the

2   nicotine derived from the tobacco.  That was the reason for

3   that -- I don't know if you refer to it as a caveat, but

4   that was what we were getting at with that portion of our

5   brief.

6           THE COURT:  So if it's sold as a kit and the

7   device is a regulatable product because the liquid that's

8   part of the kit has nicotine in it, is the system itself,

9   the atomizer, the batteries, a component of the tobacco

10  product?

11          MR. BLOCK:  Well, I don't think so, Your Honor.

12  But we're not challenging FDA's ability to regulate that

13  product as a whole.  I don't think you would say, for

14  example -- and this relates to your question about

15  components or parts -- component or part, as those words are

16  used in the statute, in other portions of the Tobacco

17  Control Act, refer to something that's a constituent,

18  physically part and parcel of the tobacco product.

19          The examples that are in the statute are a

20  cigarette, its paper and its filter are part and parcel of

21  the product that are, and those are consumed, at least

22  portions of them are consumed when the cigarette is smoked.

23  That's different from the vaping devices that we're talking

24  about here.

25          THE COURT:  Well, a component doesn't have to be

1    physically consumed when you smoke it to be a component.

2    Aren't there cigars that have plastic tips?  Is that still a

3    component of a tobacco product?

4            MR. BLOCK:  That may be.  If it's part and parcel

5    of the product, yes, Your Honor.

6            THE COURT:  All right.

7            MR. BLOCK:  And it's sold as such, the tip comes

8    on it when it's sold as the cigar.  I think we agree, that

9    would be a tobacco product.

10           THE COURT:  The government seems to suggest that

11   your initial definition of component was it has to be

12   something that's inseparable from the product, it's made

13   from tobacco, and that later you changed your definition to

14   something that has to be physically part of the product when

15   it's introduced into commerce, which is kind of where you've

16   been going.  Is there a difference between your two

17   characterizations --

18           MR. BLOCK:  I don't --

19           THE COURT:  -- and what is your current definition

20   of component?

21           MR. BLOCK:  Excuse me, Your Honor.  I apologize.

22           THE COURT:  Is there a change?

23           MR. BLOCK:  No, there is not.

24           THE COURT:  All right.  So why does the agency's

25   decision to deem open vaping systems that don't have

1   nicotine in the liquid that's being sold with them to be

2   tobacco products exceed their authority under the statute?

3          MR. BLOCK:  Because those systems are neither made

4   nor derived from tobacco, they're not intended for human

5   consumption, which is the first part of the definition.  The

6   definition goes on to say including any component, part or

7   accessory of a tobacco product.  But, again, Your Honor

8   these are not components of the tobacco product.

9          The tobacco product in this case is -- would be

10  the e-liquid.  It has some components, I guess it has the

11  nicotine and the glycerol and the -- you know, that's the

12  tobacco product, but you wouldn't say --

13         THE COURT:  You make the liquid and you sell the

14  liquid --

15         MR. BLOCK:  Yes.

16         THE COURT:  -- what standing do you have to

17  complain that they're regulating this thing that you put the

18  liquid in?

19         MR. BLOCK:  We sell --

20         THE COURT:  You sell them?

21         MR. BLOCK:  Excuse me, Your Honor.  I apologize.

22  I did not mean to speak over you.  Yes, we sell those two,

23  Your Honor.  And I would refer to the --

24         THE COURT:  Do you sell any that aren't packaged

25  with the liquid?

1          MR. BLOCK:  Yes, we do, Your Honor.  And we sell

2    liquid that doesn't have nicotine in it.  And you can buy

3    the vaping device and you can buy nicotine without liquid

4    and you can put it together.  And there's no -- there's

5    nothing that's made or derived from tobacco in that

6    combination of elements and FDA still says that's subject to

7    regulation under the Tobacco Control Act.  And that's

8    outside of FDA's statutory authority.

9          As to the products we make, Your Honor, I refer

10   the Court to the declaration of Jeffrey Stamler submitted

11   with our summary judgment motion which goes into a little

12   more detail about Nicopure's different products.

13         THE COURT:  What portion of the e-liquid market

14   doesn't contain nicotine?

15         MR. BLOCK:  It's not the majority.  I believe --

16   bear with me one second, Your Honor.  I believe we said in

17   our declaration for us -- I want to say it was 18 percent,

18   but I might have my -- 83 percent of our e-liquids contain

19   nicotine.  That's paragraph 14 of the Stamler declaration,

20   which was document 20-2.  The market as a whole, I don't

21   know, Your Honor.

22         THE COURT:  All right.  So --

23         MR. BLOCK:  But, it's non-de minimis.

24         THE COURT:  All right.  In your reply you say it's

25   unlawful for the FDA to purport to regulate what you call a

1    hypothetical combination of goods assembled by a consumer at

2    a later juncture or, quote, a hypothetical product that a

3    consumer might assemble at some point in the future.  What

4    is hypothetical about the combination of an open vaping

5    device that you buy in a vape shop and the e-liquid that you

6    buy in a vape shop that you put together and make an

7    e-cigarette?  Is there anything else in the universe that

8    somebody would do with an open vaping device besides putting

9    liquid in and vape with it?

10              MR. BLOCK:  Well, I gave you -- I believe, Your

11   Honor, I've just given you one example, which is you can put

12   in e-liquid that doesn't have nicotine, or you could put in

13   e-liquid that has nicotine that's neither made nor derived

14   from tobacco.  There are -- you know, nicotine can also be

15   made from, as I understand it, tomatoes or eggplants and

16   synthetic nicotine.  None of that would be made or derived

17   from tobacco.

18              The point we were making with the use of the word

19   hypothetical, though, Your Honor, is that FDA is saying now

20   that they have the regulatory authority to try to decide

21   what's -- what the manufacturer of the product is

22   intending -- how the manufacturer of the product is

23   intending for the product to be used.  FDA does have that

24   authority for drugs and devices, and Congress used very

25   different language in the drug and device portions of the

1    Food, Drug and Cosmetic Act than it did in the Tobacco

2    Control Act.  The Tobacco Control Act focuses on what is the

3    product made or derived from.

4            THE COURT:  Well, when I read the FDA's motion for

5    summary judgment, I thought they pretty clearly said that in

6    their view the new regulation doesn't even apply to open

7    systems when the liquid does not contain nicotine.  So

8    putting aside whether you do or don't have standing to

9    address that issue, and you do make non-nicotine liquids, so

10   I'm not so concerned about the standing issue, what issue is

11   left to be resolved once they've said that?  What does it

12   matter?

13           MR. BLOCK:  Well, as -- I don't believe that --

14   perhaps I misread FDA's brief, Your Honor.  I don't think --

15   and I'll be grateful to know from the government when they

16   get up if they concede that point, but what the government

17   is saying is there's a vaping device, you sell a vaping

18   device, it may get used with nicotine-containing e-liquids,

19   it made get used with something else, it may just sit on a

20   shelf.  We're going to regulate it because we think it's

21   reasonably likely that somebody is going to put e-liquid

22   with nicotine in it.

23           THE COURT:  One of the 83 percent of the liquids

24   that you manufacture, there's some likelihood that they

25   might put that in there?

1          MR. BLOCK:  Sure.

2          THE COURT:  Like an 83 percent chance.

3          MR. BLOCK:  It may be a very good chance, Your

4    Honor.  But the reasonably expect -- how it's reasonably

5    expected to be used is not the language that Congress used

6    in the statute when it defend a tobacco product.  It defined

7    it distinctly and different from the language that Congress

8    used elsewhere in the Food, Drug, and Cosmetic Act when it

9    was talking about devices and drugs, where you do -- where

10   the inquiry is what does the manufacturer of the device

11   reasonably expect or intend?  Congress took that out of it.

12         THE COURT:  You don't dispute if you put them in

13   the same box, the exact same open system and the exact same

14   nicotine-containing liquid, and you put them in a kit, they

15   get to regulate the kit?

16         MR. BLOCK:  Right, because the kit has -- has the

17   nicotine-containing e-liquid in it.  That's a product they

18   can regulate.

19         THE COURT:  Well, wouldn't that be an accessory

20   which they can regulate under the statute?

21         MR. BLOCK:  Would what be an accessory?  Sorry,

22   Your Honor.

23         THE COURT:  The system before you poor the liquid

24   in it.  If once it has the liquid in it it's a tobacco

25   product, before you pour the liquid in it, isn't it an

1    accessory of the tobacco --

2           MR. BLOCK:  It may be an accessory, Your Honor.

3    The FDA, in this rule, says they're not regulating

4    accessories.  Or, exercising their discretion, excuse me.

5           THE COURT:  It's not a component because it's not

6    physically attached?  I mean, when you buy components of a

7    stereo system, they're not physically attached.

8           MR. BLOCK:  Well, I guess I would put it this way,

9    Your Honor, you wouldn't say that electricity is a component

10   of the stereo system, even though the electricity runs

11   through the system to produce the sound.  I don't think you

12   would say that gasoline is a component of an automobile,

13   even though cars have gas tanks, or that, you know, wind is

14   a component or a part of a fan, even though a fan takes --

15   I'm sorry, that air is a component or part of a fan, even

16   though a fan takes air and circulates it.  It doesn't fit

17   the plain and ordinary meaning --

18          THE COURT:  The liquid is the gas.  Wouldn't you

19   agree that the structure that -- the gas tank is a component

20   of a car --

21          MR. BLOCK:  Yes.

22          THE COURT:  -- even before you put the gas in?

23          MR. BLOCK:  Yes, I agree it's a component of a

24   car, but you wouldn't say that a car is a gasoline product.

25   And the hook for FDA to regulate has to be the product that

1     is made or derived from tobacco.  And we're not -- we're not

2     to the APA argument, so I'm not going to go there.  We have

3     issues with the way in which FDA has gone about regulating

4     those products over which it has statutory authority to

5     exercise lawful rulemaking.  But in this rule they have gone

6     separate and apart from the APA issues with what they're

7     allowed to regulate; they've purported to have the authority

8     to regulate products that are not tobacco products.  That's

9     the challenge.

10              THE COURT:  The system, the non-nicotine-containing

11    liquid and the synthetic liquid?

12              MR. BLOCK:  Synthetic --

13              THE COURT:  Synthetic nicotine containing --

14              MR. BLOCK:  Liquids -- yes.  Yes.  Correct.

15    Correct.

16              THE COURT:  Now, without the labeling and the list

17    of ingredients that they're asking for, how are they

18    supposed to know whether you have synthetic nicotine or you

19    don't have synthetic nicotine?

20              MR. BLOCK:  Well, that's a bit of -- if that's a

21    chicken and egg issue, Your Honor, it's an issue of the

22    creation -- Congress's creation in the statute.  This is

23    also why, though -- let's go to the vaping system.

24    Submitting an ingredient listing for the ingredients in the

25    gas tank or the ingredients of the battery or the

1    ingredients of the software -- they say software is a

2    tobacco product -- I don't know how you would -- I don't

3    know what the ingredients of software are; Java code, BASIC?

4    This is further indication and evi -- I'm not sure evidence

5    is the right word to use here, but that's further indication

6    that FDA has aggrandized for itself in this rule statutory

7    authority that it does not have and was not granted by

8    Congress.

9            As to the weather you have to -- and I think your

10    question about the ingredient listing, that goes in part to

11    our APA concern here, if I may answer it.  And I don't want

12    to get us too off track.  But Congress -- sorry, FDA says we

13    need to know what's out there.  We want listings of the

14    stuff.  There were ample tools available to FDA short of

15    what it did in this rule, if that was its -- which it seems

16    to be its primary objective, which would have been -- you

17    know, could have just done a regulation under their general

18    rulemaking authority asking people to -- requiring people to

19    submit a list of the ingredients.  You don't have to go

20    through the deeming apparatus.  And FDA did not need to go

21    through the deeming actions and all of the unintended

22    consequences, or perhaps intended, that come with that.

23            THE COURT:  Well, after *Sottera* where the D.C.

24    Circuit said no, you can't use the drug and device approach,

25    you have to use the Tobacco Control Act approach, how is

1     that the right answer?

2            MR. BLOCK:  Sorry, Your Honor.  They have residual

3     rulemaking authority under 371 or 271.  I probably got the

4     first digit incorrect.  271a under the Act as a whole, which

5     includes both the food and drug components and the Tobacco

6     Control Act.  And this was pointed out in the comments to FDA.

7            THE COURT:  All right.  Let me ask the government

8     about the statutory authority issue.  I know we could talk

9     about any of these issues all day, but we have a lot of

10    that.

11           All right.  So there doesn't appear to be any

12    dispute in this case, in this room at least, concerning the

13    regulation of closed systems.  With respect to open systems,

14    is it your position that the device is the tobacco product

15    or the liquid is the tobacco product?

16           MR. BECKENHAUER:  Your Honor, I think both are

17    tobacco products under the definition set forth by Congress.

18    Clearly an e-liquid that contains nicotine is a tobacco

19    product.  That can only be consumed by a human using a

20    device.  So I think it's as simple as that.  The device is,

21    therefore, also a tobacco product.

22           THE COURT:  Where is the language in the statute

23    that says the thing that makes it consumable by a human is a

24    tobacco product?  That's the component?  That's your argument?

25           MR. BECKENHAUER:  I think that's the clear

1     statutory hook, but I would also direct Your Honor to the

2     phrase, Any product made or derived from tobacco that's

3     intended for human consumption.  So clearly intent for human

4     consumption is relevant to the regulatory definition adopted

5     by the agency here.

6              THE COURT:  The statutory definition is any

7     product made or derived from tobacco, including any

8     component, part or accessory of a tobacco product.

9              MR. BECKENHAUER:  So I think we're missing just a

10    little phrase in there.  It's any product made or derived

11    from tobacco that is intended for human consumption,

12    including any component, part or accessory.

13             THE COURT:  All right.  But, that's that the

14    product is intended for human consumption.  But the product

15    still has to be made or derived from tobacco or a component,

16    part or accessory of a tobacco product, right?

17             MR. BECKENHAUER:  Correct.

18             THE COURT:  So is it -- are you saying that the

19    entire electronic nicotine delivery system is a tobacco

20    product, not the batteries in and of themselves or any of

21    the pieces that make it up?

22             MR. BECKENHAUER:  I think that's correct under the

23    statutory definition.

24             THE COURT:  All right.  So, if you have an

25    electronic nicotine delivery system but you didn't put

1      nicotine in it, you've got their famous peanut butter

2      flavored non-nicotine-containing, contains no peanuts

3      either, liquid in there, is it a tobacco product anymore?

4              MR. BECKENHAUER:  It is, Your Honor, because it's

5      intended for the consumption of nicotine-containing

6      e-liquids.  Sure, I guess it's hypothetically possible that

7      someone could use an e-cigarette to consume e-liquids that

8      don't contain nicotine, and certainly that's true in some

9      circumstances.  But, you know, I think it's important that

10     we not lose sight of the fact that here we're dealing with a

11     plaintiff whose name is Nicopure.  Clearly their very reason

12     for being is to deliver nicotine to consumers.

13             THE COURT:  Well, and the other plaintiffs call

14     the things that they're telling us are not tobacco products

15     electronic nicotine delivery systems.

16             MR. BECKENHAUER:  Correct.

17             THE COURT:  But let me ask you this:  Most of the

18     litigation here, the whole -- really, the crux of this case

19     is about whether the empty device and the things that make

20     it up, the batteries, the atomizers, etcetera, are

21     components of a tobacco product.  And plaintiffs say they're

22     not because they're not constituent elements of the tobacco

23     product.  But why does the FDA go out of its way to

24     specifically forgo reliance on language that includes

25     accessories if it wanted to regulate the open device with or

1    without liquid in it?

2            MR. BECKENHAUER:  Well, I -- perhaps it could have

3    adopted a different definition of components and parts and a

4    different definition of accessories that would have embraced

5    those kinds of devices, and I think that route was perfectly

6    open to it.  But I think the route it chose was reasonable

7    here and was in keeping with the text and context of the

8    statute.

9            I think the FDA reasonably saw no need to expand

10   its regulatory resources, regulating things that it has now

11   considered accessories, like various packaging or, you know,

12   traditional matchbooks, ashtrays.  You know, there's a

13   number of different kinds of accessories that are quite

14   incidental to the consumption of tobacco products that the

15   FDA has decided not to use its resources regulating.

16           But it's navigated this line and it's adopted the

17   definition of component or part, which of course the statute

18   leaves undefined, Congress left undefined, and its

19   definition of component or part is in keeping with the text

20   and context of the statute, including how Congress

21   understood the terms component or part to be used when

22   dealing with other kinds of tobacco products.

23           THE COURT:  So the device, the open device is a

24   component of a tobacco product surely when you pour liquid

25   in that has nicotine.  And you're saying even when you don't

1    pour liquid in that has nicotine, when it's empty, it's a

2    component of a tobacco product because 83 percent of the

3    liquid that Nicopure is putting in the market, reasonably

4    expected to be poured into it, contains nicotine?

5        MR. BECKENHAUER:  I think that's absolutely right.

6    And if I can make one point of clarification.  I think it's

7    telling that Nicopure tells us that 13 percent of its stock-

8    keeping units represent nicotine-free e-liquids, but they're

9    not telling us that 13 percent of their sales of nicotine-

10   free -- or, 13 percent of their sales, their actual sales

11   dollars of e-liquids are nicotine-free products.  I suspect

12   it's much lower.

13       So, I think the notion that, yes, sometimes these

14   devices could be used to consume nicotine-free e-liquids,

15   it's rather like saying that you couldn't consider guns to

16   be dangerous weapons because sometimes they can shoot

17   blanks.  I mean, sure, that's true and it happens, but the

18   very reason for the existence of these products is so that

19   users can consume nicotine.

20       THE COURT:  All right.  Well, maybe I misread

21   something because counsel for Nicopure seemed surprised

22   about it.  So, let me ask you, I thought you said in your

23   brief, from page 33 to 34, that the rule doesn't even cover

24   open systems that contain liquids that don't contain nicotine.

25       MR. BECKENHAUER:  Your Honor, I'm not -- I can't

1    pull to mind the page in the brief that you're thinking

2    about.  I could turn to it, but that's -- regardless, that's

3    not --

4              THE COURT:  Well, first you said they don't have

5    standing to challenge it because they don't make it, but

6    then you said, in any event, we're not regulating that --

7              MR. BECKENHAUER:  Got you.

8              THE COURT:  -- in this rule.  Is that true?

9              MR. BECKENHAUER:  So I think the confusion here

10   has to do with the difference between the devices and the

11   nicotine-free e-liquids.  So our position is that the

12   devices, whether they're closed system, whether they're open

13   system, are components, are parts of the tobacco product,

14   whether or not they contain e-liquid at the moment.

15             With respect to plaintiffs' challenge to -- thank

16   you.  With respect to plaintiffs' challenge to nicotine-free

17   e-liquids, there what we've said is the Court doesn't need

18   to reach that part of plaintiffs' challenge.

19             THE COURT:  Because you are -- the rule does not

20   cover nicotine-free e-liquids?

21             MR. BECKENHAUER:  Not necessarily.  It covers some

22   of them.  And so I want to be perfectly clear with this.

23   I'm not trying to hide the ball.  So the rule doesn't

24   purport to cover all nicotine-free e-liquids, it only

25   purports to cover them under certain circumstances, and

1     those are when the nicotine-free e-liquid is made or derived

2     from tobacco.  So one example is a tobacco-flavored

3     e-liquid, regardless of its nicotine content.  Another

4     example is if the nicotine-free e-liquid meets the

5     regulatory definition of component or part.  And so one

6     example of that that the FDA gave is nicotine-free e-liquids

7     that are intended to be mixed with liquid nicotine.

8              And so why we said the Court doesn't need to reach

9     that challenge is that plaintiffs simply haven't established

10    standing to raise that challenge and they haven't

11    established that challenge as a right.  So, that --

12             THE COURT:  But after you say don't worry about it

13    and they don't have standing to worry about it because the

14    rule doesn't cover these categories of liquid, then you went

15    on to argue that there are other chemicals in those liquids,

16    even though there are ones that don't have nicotine in them,

17    that can be harmful.  And how can those harms be what

18    justifies the regulation when without the tobacco derivation

19    it's not a product subject to regulation?

20             MR. BECKENHAUER:  So, again, then we're --

21    assuming the Court isn't talking about standing, isn't

22    talking about ripeness, which, you know, we don't think the

23    Court needs to reach this issue because there is no standing

24    on ripeness, But if the Court decides to reach the merits,

25    then -- first, if I could step back for a minute.

1          You know, plaintiffs concede that the FDA can

2    regulate even nicotine-free e-liquids under certain

3    circumstances, such as those that are made or derived from

4    tobacco, like the tobacco flavored ones.  So I think that's

5    enough to reject what's effectively a facial challenge to

6    that portion of the rule.  Again, plaintiffs haven't

7    established that any portion of the regulation actually

8    applies to any of their nicotine-free e-liquids.

9          THE COURT:  My question is a little narrower,

10   which is should I pay any attention to the part of your

11   brief that says even if it's not tobacco derived, even if it

12   doesn't have nicotine in it, it's got this chemical in it

13   and that chemical in it and God knows what people are

14   breathing in and it really might not be good for them.  If

15   it doesn't have the tobacco hook, you're not regulating it,

16   isn't that what you're telling me?

17         MR. BECKENHAUER:  No, I don't think that's

18   necessarily true.  I think it's possible that the FDA would

19   regulate a nicotine-free e-liquid if, for example, it were

20   intended or reasonably expected to be mixed with liquid

21   nicotine, for example, by a user.  So, if Nicopure had told

22   us that it's packaging its nicotine-free e-liquids together

23   with liquid nicotine for sale to a consumer, then there

24   might be a reason for the FDA to regulate that.  If Nicopure

25   had told us that it had reason to believe that its consumers

1    were mixing its nicotine-free e-liquids with nicotine liquid

2    that they have at home, you know, then this would be another

3    story.  But that's not what Nicopure is telling us.

4    Nicopure hasn't even made, you know, the sort of conclusory

5    allegation that its nicotine-free e-liquids meet the

6    regulatory definition.

7            But, if they did and if there were reason to

8    believe that Nicopure's nicotine free e-liquids were being

9    mixed with liquid nicotine, then they would meet the

10   definition of component or part as the FDA has defined it.

11           THE COURT:  But do you dispute the notion that

12   there are some people that put a non-tobacco flavor,

13   non-nicotine-containing liquid in their system and light it up?

14           MR. BECKENHAUER:  No, we don't dispute that that

15   sometimes happens.  We dispute that --

16           THE COURT:  To the extent those liquids exist,

17   they're not covered by your regulation, even if the system,

18   in your point of view, is?

19           MR. BECKENHAUER:  The would only be covered by the

20   regulation if the nicotine-free e-liquids were intended or

21   reasonably expected to be mixed, otherwise met -- let me

22   back up.  They would only be covered by the regulation if

23   they met the regulatory definition of component or a part.

24   And one example of that is if they were intended or

25   reasonably expected to be mixed with liquid nicotine.  So

1  the reason that's --

2          THE COURT:  And that's the regulatory definition,

3  that's not the statutory definition.

4          MR. BECKENHAUER:  Correct.

5          THE COURT:  And where is the basis for that

6  regulatory definition in the statue?  Just in the use of the

7  word component and be intended for human consumption aspect

8  of it?

9          MR. BECKENHAUER:  I think that's right, Your

10  Honor.  Congress left those terms undefined, and I think the

11  agency's interpretation of them is consistent with the text

12  in the statute.  And, again, I think it made sense that the

13  FDA was looking to how those -- how an e-liquid could affect

14  the performance or composition or constituents or character

15  of tobacco product, it made sense that FDA looked at those

16  elements because it's consistent with how Congress

17  understood the terms component or part to be used elsewhere

18  in the statute.

19          THE COURT:  All right.  Well, plaintiffs point out

20  that some nicotine is synthetic.  Is it the government's

21  position that it can regulate any e-cigarette with

22  nicotine-containing liquid, even if that nicotine is not

23  derived from tobacco?

24          MR. BECKENHAUER:  Your Honor, I don't think the

25  Court needs to reach that question because I don't think any

1     plaintiff here has alleged that they manufacture nicotine-

2     containing e-liquids from a source other than tobacco.

3           THE COURT:  Well, I think that the Right to be

4     Smoke-Free Trade Association plaintiffs seem to indicate

5     that some of what some of their members sell has synthetic.

6     In their complaint don't they say some of it is derived from

7     tobacco and some is synthetic?

8           MR. BECKENHAUER:  I'm not sure that they allege --

9     I'm not sure that they claim that any of their members

10    actually produce e-liquids containing nicotine from other

11    sources.  And our understanding is that that's not

12    economically feasible at this point because the -- because

13    it's just much, much, much more expensive to extract

14    nicotine from other sources, like eggplant, than it is to

15    extract it from tobacco leaf.

16          THE COURT:  Especially when you could be making

17    moussaka or something out of the eggplant.

18          All right.  Let me go on to the APA argument.  So

19    Mr. -- you can come back.

20          MR. BLOCK:  All right.

21          THE COURT:  Mr. Block.  I'm sorry.

22          MR. BLOCK:  That's all right, Your Honor.

23          THE COURT:  And I know, I can see from your body

24    language that you have a lot that you would like to say in

25    response to what he was saying.

1              MR. BLOCK:  I'm here to answer the Court's

2     questions.

3              THE COURT:  I understand your argument, I understand

4     his argument; that's really what I'm trying to do.  And I

5     will, as I say, give you an opportunity, if there's really

6     something important you want me to think about in rejecting

7     their arguments, to tell me that.

8              But going on to your argument.  Both plaintiffs'

9     argument, that the deeming itself cannot withstand scrutiny

10    under the APA, I just want to clarify, when you're talking

11    about the APA review and the flawed cost-benefit analysis or

12    the health analysis that underlies this decision, are you

13    only talking about the application of the deeming rule to

14    open systems still, or now you're talking about the whole

15    ball of wax, all e-cigarettes?

16             MR. BLOCK:  To the vaping industry, yes, Your

17    Honor.

18             THE COURT:  Okay.  All right.  Now, we know what

19    the provision in the Tobacco Control Act says, which is that

20    this -- the Act applies to any other tobacco product that

21    the secretary, by regulation, deems to be subject to the

22    subchapter.  And I certainly think I understand your

23    argument about why the government's wrong when it says the

24    decision to deem is so committed to discretion that it's not

25    subject to judicial review at all.  You say, Well,

1    notwithstanding the use of the word deemed, there's a

2    definition of tobacco product to be applied in reviewing the

3    way an agency construed the statute, as courts do all the

4    time.  And that makes perfect sense to me.  And according to

5    its reply, apparently the FDA doesn't dispute that I can

6    address the issue we just spent some time addressing, which

7    is whether the agency exceeded its statutory authority.

8            But you're asking me to do more than review the

9    FDA's application of the words tobacco products to open

10   systems.  That's section one of your memo.  Section two,

11   you're asking me to review the reasonableness of the entire

12   deeming decision under the APA.  And so since the statute

13   gives such broad discretion, without any limits, any product

14   agency secretary deems, why is that subject to judicial review?

15           MR. BLOCK:  Well, to begin, Your Honor, I think

16   the FDA's concession that this Court has jurisdiction and

17   the ability to review the rule under the Administrative

18   Procedure Act answers that question, I think.  The

19   Administrative Procedure Act doesn't turn off and on like a

20   light switch, it --

21           THE COURT:  Well, what they said is I can review

22   the legality of their reading of tobacco products, but not

23   the arbitrary and capricious nature of the deeming beyond

24   the open systems that your argument two opens out into.

25           MR. BLOCK:  Well, I think that is a concession,

1    though, Your Honor, that the agency's -- the agency's action

2    is not committed to its own discretion by law, there's more,

3    but there's plenty more.  To begin, the rule itself -- maybe

4    this isn't where I should begin, but I should point out that

5    in the rule itself FDA recognized that its rulemaking was

6    subject to APA review.  And that's at page 28,985 of the 81

7    Fed. Reg. 28985, responding to comments that said that FDA

8    was acting contrary to the Administrative Procedure Act.

9         So FDA did not say in the rule that they could do

10   whatever they wanted, they could deem however they deem to

11   deem and it was not subject to judicial review, that's -- I

12   think the FDA has a real problem in coming in now and making

13   that argument.  But equally, if not more important, there is

14   a strong presumption, as Your Honor is well aware, the *Mach

15   Mining* Supreme Court case from 2015 is, you know, one of the

16   most recent examples of a strong presumption favoring

17   judicial review of administrative action.

18        THE COURT:  Well, let's say I agree with you on

19   that point.  What is the standard to be applied when

20   reviewing the agency decision to deem under the APA?  Your

21   brief says several times, on page 1, in your headings on

22   page 15, the decision can't withstand what you call hard-

23   look scrutiny.  You repeated it again in your reply, you put

24   quotes around it, but you don't cite a single case that uses

25   that formulation and I'm not familiar with hard-look

1    scrutiny as some kind of APA scrutiny that applies in this

2    circumstance.  So what are you talking about and where does

3    that standard supposedly come from?

4          MR. BLOCK:  I'm talking about the scrutiny that

5    courts give rulemakings, legislative rules under the

6    Administrative Procedure Act, which I believe the

7    commentators refer to and that's why it was in quotes as

8    hard-look review.  But it comes from, among other cases,

9    *Motor Vehicles against State Farm*, from *Citizens* --

10         THE COURT:  That case doesn't use the word hard-

11   luck.  I mean, you put it in quotes, like there's some thing

12   that you're referring to, you're purporting to quote

13   something.  And I looked all over to figure out what it was

14   because I never heard of that standard and I don't

15   understand why you would make me think that you're citing a

16   case when you're not.

17         MR. BLOCK:  I'm sorry, Your Honor.  I would

18   have -- what we're citing is the general principles that are

19   applied.  But to quote a case, if I may.

20         THE COURT:  Okay.

21         MR. BLOCK:  To quote a case from *Citizens to*

22   *Preserve Overton Park*, this Court --

23         THE COURT:  The EPA does have the hard look --

24   that comes up in the EPA context, is that what you're saying?

25         MR. BLOCK:  No.  I'm saying it comes up in the

1    Administrative Procedure Act context, that the

2    Administrative Procedure Act requires a thorough -- I'm

3    quoting, thorough, probing, in-depth review, end quote, of

4    the agency's reasoning.  And again to quote, searching and

5    careful, end quote, an assessment of the rule's underpinnings

6    and --

7             THE COURT:  I don't have any problem with the fact

8    that we have to do all those things if we undertake APA

9    review.  What I take issue with is your choices in drafting

10   something, to put something in quotes suggesting to me that

11   there's something -- that it's a term of art that applies in

12   the APA context when it doesn't.  Again, it's just sort

13   of -- I think it undercuts the power of your argument to do

14   that.  So I wouldn't do that in the future.

15            MR. BLOCK:  Understood, Your Honor.  If I may, but

16   the point -- the APA -- FDA says, APA you just -- you know,

17   it's a rule, it's got 100 pages, we looked to comments,

18   we're good.  That's not what the APA requires of this Court.

19   And I know Your Honor knows -- I'm sorry, so I -- you have

20   to -- this Court needs to look at the reasons FDA said it

21   was acting, the evidence, the comments, FDA's consideration

22   of the comments, FDA's consideration or lack thereof of

23   reasonable alternatives to the course taken, and whether the

24   explanations for the course taken are -- make sense in light

25   of the record that was before the agency.  And we think on

1   all of those prongs, this rule falls short.  That's not to

2   say that FDA isn't able to do a lawful rule over tobacco

3   products over which it has statutory authority, but this

4   rule fails APA review.

5              THE COURT:  All right.  Does the legislative

6   history indicate that Congress was aware of the existence of

7   e-cigarettes back in 2009?

8              MR. BLOCK:  Yes.

9              THE COURT:  What does the broad grant of authority

10  to deem against that known background say about

11  Congressional intent that the FDA take action as these

12  products hit the market and mushroomed the way they have?

13             MR. BLOCK:  Well, I think it says that Congress

14  expected the FDA to act, to consider all of the factors

15  under the statute and to act when all of the evidence before

16  the FDA indicated that action was appropriate.  Because

17  Congress was aware of e-cigarettes but didn't include them

18  as products that were immediately subject to the Act, and

19  perhaps would never be subject to the Act.

20             And Congress said to FDA in the Act, we're giving

21  you the toolmaking for appropriate regulation.  Congress did

22  not say we're -- and we're leaving it to you, you've got the

23  keys to the kingdom and you go off and do whatever you want

24  whenever you want to do it for whatever reasons you think

25  you should do it.  That is not what Congress directed.

1            THE COURT:  You're right.  In the purposes section

2       they list ten purposes and the eighth one is to enable the

3       FDA to promulgate appropriate regulation.  But in their

4       statement of findings, they said -- Congress said, in

5       paragraph 44, the Food and Drug Administration is a

6       regulatory agency with the scientific expertise to identify

7       harmful substances and products to which consumers are

8       exposed, to design standards to limit exposure to those

9       substances, to evaluate scientific studies supporting claims

10      about the safety of the products, and to evaluate the impact

11      of labels, labeling and advertising on consumer behavior in

12      order to reduce the risk of harm and promote understanding

13      of the impact of the product on health.

14            In connection with its mandate to promote health

15      and reduce the risk of harm, the Food and Drug Administration

16      routinely makes decisions about whether and how products may

17      be marketed in the United States.  Doesn't that sort of

18      suggest that Congress is saying it's really up to them, you

19      should defer to them?

20            MR. BLOCK:  We're not begrudging FDA its

21      expertise, Your Honor.  But when you look at how that

22      expertise was applied in this rule, the rule cannot stand.

23      And if I may, FDA says, on page 1 of the rule, that they're

24      taking this action to reduce the death and disease from

25      tobacco products.  They go on to say, though, in the rule,

1     that the effects from nicotine exposure by inhalation

2     without combustion, which is the vaping products, are likely

3     not responsible for the high prevalence of tobacco-related

4     death and disease in this country.  That's at page 28,981.

5            They go on to note that nicotine itself has not

6     been shown to cause the chronic diseases associated with

7     tobacco use; same page.  And they say -- oh, I'm sorry, go

8     back to the beginning.  So we're going to do this to reduce

9     death and disease, but these products don't cause the death

10    and disease.  And they say deeming all the products will

11    result in significant benefits to the public health, they

12    say that on -- FDA says -- the rule says it on the first

13    page, 28,975, and then six pages later says the direct

14    benefits are difficult to quantify and we can't predict the

15    size.

16           And they actually say, in the final regulatory

17    impact analysis, and this is page 29,030 of the

18    administrative record -- let me make sure I've got the right

19    page here -- that this rule may have a negative health

20    benefit, net health benefit.  That is an internal

21    inconsistency under the Administrative Procedure Act.

22           THE COURT:  That's a major theme of your brief,

23    you've argued in your brief and you've argued in your reply,

24    you say over and over again e-cigarettes are less dangerous

25    to health than cigarettes, which isn't -- the question is,

1    you know, is that really saying very much?  Maybe that's

2    true, but is that the standard for whether they should be

3    subject to regulation at all?  Does the record reflect that

4    there are no health risks from inhaling nicotine vapor?

5              MR. BLOCK:  No, the record does not reflect that,

6    Your Honor.  But the question is whether -- excuse me.

7              THE COURT:  Does the record reflect that it's

8    better for an individual, for the public health, to vape

9    than to not use any nicotine-based product at all?

10             MR. BLOCK:  No, it does not, Your Honor.

11             THE COURT:  So why does it have to be as dangerous

12   as cigarettes for it to be reasonable to regulate?

13             MR. BLOCK:  Because, Your Honor, you have to

14   compare the reasons that FDA proffered for taking its

15   action, which is on the first page, which I just read, with

16   the -- with what the comments and the rule shows.  And so

17   they say they're acting in the interest of the public

18   health, this is going to benefit the public health, but

19   admit in the next breath, we actually don't know if it's

20   going to benefit the public health, and admit, if you go

21   back in the rulemaking, actually this could make things

22   worse.  That's a problem.

23             THE COURT:  Why does the government have to

24   demonstrate a negative impact on public health just to

25   regulate, when the regulation is largely about labeling and

1    informing consumers about the ingredients?

2         MR. BLOCK:  When the government -- excuse me, when

3    the agency says the reason we're doing this is to improve

4    the public health and the rule itself says but we may make

5    it worse, that is an inconsistency under the APA.  If FDA

6    said we're doing it for a different reason, maybe.  But this

7    Court has to review the agency's rule against the reasons

8    that the agency set forth.  And there's just -- I'm sorry.

9         THE COURT:  I think you're somewhat overstating

10   their saying this may make it worse.  But how can the entire

11   industry resist regulation on the grounds that vaping has

12   not yet been proven to be sufficiently unhealthy, if they

13   don't even want to tell the consumers what's in the liquid?

14        MR. BLOCK:  Well --

15        THE COURT:  I mean, how is the FDA or any consumer

16   supposed to make informed choices about their health if you

17   don't want to tell them what's in the liquid?

18        MR. BLOCK:  I'm not sure I know the basis for the

19   statement that we don't want to -- I think, you know,

20   Nicopure tells folks --

21        THE COURT:  This is the regime that you're

22   objecting to.  The regime doesn't say you can't sell it, you

23   can't market it, they can't buy it.  It says you have to

24   tell us what's in it.

25        MR. BLOCK:  Well, that's not all it says, Your

1    Honor, and that's part of the problem.  But, that goes to

2    the second -- a second major failing of this rule under the

3    Administrative Procedure Act, and that was the failure to

4    consider reasonable alternatives.  Because if what FDA was

5    really concerned about was wanting listing of ingredients,

6    they had -- and comments pointed this out, they had

7    alternate means or discretion under the Tobacco Control Act

8    to require that and not, as Your Honor knows, the real

9    killer in this rule to the industry, the reason this is an

10   existential threat to the vaping industry is the premarket

11   authorization requirements and the likely insurmountable

12   pathway to approval for the majority of small businesses

13   that make up this vaping industry.

14        FDA says -- and FDA acknowledges we can -- I

15   suppose that Mr. Gotting is going to talk more in depth

16   about this.  FDA acknowledges at some level that this rule

17   is going to result in the mass exodus of products from the

18   industry because the small businesses can't afford to

19   comply.  They say, you know --

20        THE COURT:  All right.  All right.

21        MR. BLOCK:  I'm sorry.

22        THE COURT:  Let's get at the question of how I'm

23   supposed to analyze this.  With respect to the items that

24   you agree are tobacco products, and if I disagreed with you

25   about the others, but anything that's a tobacco product,

1    don't the things that the statute requires of manufacturers

2    in, particularly, the premarket review automatically kick in

3    pursuant to statute?  You object to the requirement for

4    premarket review as being particularly onerous and

5    unreasonable.  That's really why you're here.  And you're

6    very dismissive and sarcastic when you say the FDA's

7    argument that this requirement is imposed by statute and was

8    not subject to agency discretion, you attack them for that.

9         But 21 U.S. Code § 387j says, A new tobacco

10   product is any tobacco product that wasn't commercially

11   marketed as of February 15, 2007, and premarket review is

12   required -- required, that's in the statute -- for any of them.

13   So when you list all the burdens that the new rule imposes,

14   in particular the insurmountable burden of the premarket

15   authorization that's imposed by the statute and not the

16   rule, so how can you challenge it under the APA?

17        MR. BLOCK:  Well, in several respects, Your Honor.

18   To begin, FDA -- if FDA was of that view, that it had no

19   discretion under the statute, then did they adequately take

20   that into consideration in weighing the alternatives before

21   them in embarking upon the decision to deem the vaping

22   products?  Back to my first point, which I understand -- I

23   think I made a couple times, but that's a threshold

24   question, knowing that the consequence of deeming is going

25   to be -- to cause this mass exodus from the industry and

1      crush the small business, does the reason FDA gave for

2      acting back -- is it backed up by the evidence that was

3      before FDA and the rationale?  And I respectfully submit it

4      was not because they said we need to do this for the public

5      health, but we don't know if it's actually going to help the

6      public health.  So they should have --

7              THE COURT:  You keep talk about crushing the

8      industry.  And didn't we already establish that two-thirds

9      of the industry are the single use, closed systems that are

10     manufactured by the big tobacco companies?  That's not being

11     crushed by this, is it?

12             MR. BLOCK:  I'm sure more well-resourced companies

13     will have a better chance of getting something approved than

14     the vast majority of small business.  When I say the

15     industry, the majority of the industry, in terms of the

16     number of members and the population are the small

17     businesses, Nicopure being one of them.  That's also in the

18     record.

19             THE COURT:  But what you're not -- you're not

20     worried about the huge portion of the market that makes the

21     e-cigarettes, you're talking about the small companies now

22     that have popped up to sell the liquids.  And one of the

23     reasons there's so many companies is because there's a big

24     demand for this liquid, right?  So isn't the fact that

25     there's this multiplication of small businesses out there

1    putting stuff into bottles and not labeling what's in there,

2    doesn't that alone start to point to why it would be

3    reasonable for the APA -- for the FDA to get involved?

4            MR. BLOCK:  Well, there's -- I think there are

5    multiple questions there, Your Honor.  There's get involved

6    and then there's get involved in what capacity?  Again, so,

7    if -- begin with the -- I've pointed out what we think are

8    the inconsistencies between the stated basis and purpose for

9    the rule and what the evidence before the agency that --

10   that the agency repeatedly acknowledges about the relative

11   risk of vaping products and the fact that vaping products

12   may in fact be helping consumers transition away from the

13   combustible tobacco products which are, FDA says throughout

14   the rule, the ones -- the types of products that cause the

15   disease, the chronic disease that Congress was talking about

16   in the Tobacco Control Act.

17           THE COURT:  It may be, but I think there's also

18   evidence that it's creating this whole new large young group

19   of people that vape.

20           MR. BLOCK:  I'm sorry --

21           THE COURT:  There's a lot in the record about

22   people that never smoked, that just vape.

23           MR. BLOCK:  Um, there is -- there is --

24           THE COURT:  Some people --

25           MR. BLOCK:  Excuse me.  I'm not sure specifically

1    which portion of the record Your Honor is referring to.  FDA

2    does say through the rule that they're concerned that youth

3    will vape, I get that.  But then if the issue was we need

4    more information about products or we need to keep -- to

5    prevent the sale of the products to youths, there are ways

6    to do that and FDA had the ability either to fashion

7    additional discretion within compliance periods under the

8    Tobacco -- under the Control Act if they were going to deem,

9    or under its residual rulemaking authority under 21 U.S.C.

10   371a to craft a different rule to get at those issues, to

11   get at the additional information.

12          The rule talks about -- the rule says time and

13   time again FDA doesn't have enough scientific evidence to

14   know the real -- there haven't been enough studies and it

15   hasn't gone on long enough to know whether -- excuse me,

16   vaping products are or aren't a bridge to combustible

17   tobacco products.  And in fact, some of the evidence

18   suggests that they're actually working the opposite way and

19   they're getting people off of combustible tobacco products

20   and into something that's 95 percent better, which would be

21   a net public health benefit, which will go away if those

22   products disappear from the market in any material degree

23   because all that's going to do is reinforce the status quo

24   of combustible cigarettes.

25          THE COURT:  Well, maybe and maybe not.  But

1     getting back to the argument that you seem to make over and

2     over again, which is the premarket authorization was an

3     abusive of agency discretion.  You're not arguing that.  All

4     you're saying is the deem, no deem was an abuse of

5     discretion because once you deem, they had no choice but to

6     require premarket authorization, isn't that right?

7                MR. BLOCK:  I'm focused on the deem, not deem.  I

8     think Mr. Gotting has additional arguments about the once

9     they deem, how much discretion they have.  I don't want to

10    speak for his class.

11               THE COURT:  Because I don't see any in the statute

12    and they do seem to have at least phased it in time-wise.

13    So I don't understand how that can be challenged under the

14    APA.  But if he's going to talk about that, I would like to

15    hear about that.

16               MR. BLOCK:  So may I --

17               THE COURT:  And I also -- one of the reasons you

18    say the deeming rule is unreasonable is because it would

19    require premarket approval of batteries.  But the rule

20    itself says the FDA is going to limit enforcement of

21    premarket approval to finish tobacco products.  So why is

22    that a concern?

23               MR. BLOCK:  They say -- that may be -- that's what

24    they're going to do now, but they're reserving the right to

25    come back and require it.  It's -- so I don't -- I think

1    that's sort of FDA trying to give itself a pass on having

2    purported to exert authority over products for which it

3    doesn't have the statutory authority to regulate.

4         But for this portion of the argument, for the APA

5    portion, I'm focused on the -- we're focused on the decision

6    to deem the vaping products.  And there are three main APA

7    prongs, the first being that that's -- that there's an

8    internal inconsistency between the record and the stated --

9         THE COURT:  The health justification.

10        MR. BLOCK:  -- proffered goals.  And the second,

11   and this is required under the Administrative Procedure Act

12   by, among other cases, *Allied Local*, 215 F.3rd 61, that's

13   D.C. Circuit 2000, that an agency has to consider

14   significant alternatives to the course it chooses and

15   explain why it's picking one over the other.  And here, we

16   submit, FDA did not adequately explain or adequately

17   consider other alternatives to the all-or-nothing,

18   deem-or-no-deem approach, including asking for -- doing more

19   studies, collecting more information pursuant to its general

20   rulemaking power under 21 U.S.C. 371a.

21        It could have asked people -- it could require

22   folks to submit information without subjecting to premarket

23   review.  It could have -- it, similarly, could have

24   considered under that rulemaking authority the -- what the

25   comments refer to as the EU approach, which is to have the

1    information requirements --

2             THE COURT:  Congress didn't pass the EU approach.

3    Congress passed the Tobacco Control Act, said if you are a

4    tobacco product, then these things will happen.

5             MR. BLOCK:  What Congress said is if you deem,

6    these things will happen.  But Congress also had given FDA

7    residual rulemaking authority to be more -- to be even more

8    flexible.  If FDA is right, that it has no flexibility once

9    it deems, then the failure to consider the other --

10            THE COURT:  I just asked you if they were right

11   and you said you didn't want to get into that.  So when you

12   say if they're right, where is the statutory flexibility

13   after the deeming to free any tobacco product, new tobacco

14   product from premarket review?  Where's the flexibility in

15   the statute?

16            MR. BLOCK:  Well, I don't want to over -- mindful

17   of your order not to duplicate argument that Mr. Gotting is

18   going to make.  I will say this, this goes back to FDA's

19   point at the beginning, we have so much discretion we can --

20   our rulemakings are unreviewable, and then to turn around

21   and say but we actually have no discretion once we make a

22   rule, that's another internal inconsistency.

23            THE COURT:  No, it's not.  And since I'm right on

24   that issue right now, let me hear from the other plaintiffs'

25   counsel.

1          So are you the one who says that once the deeming

2     happens, they still had discretion to decide whether

3     premarket review would be required or not?

4          MR. GOTTING:  We are not quite taking that

5     position.  So we have two arguments.  First position is that

6     they simply had -- if they're going to force us into the

7     PMTA process, they had to consider our comments that we're

8     not going to have enough time to do those long-term studies

9     to satisfy the population effects standard.

10          So that argument assumes that we are doing PMTA.

11     We're going to do it.  We just need to know that the

12     compliance period is long enough for us to do those

13     long-term studies.  And it's our position they never

14     considered it.  So that a straightforward APA, they needed

15     to consider it and tell us why two years is long enough.  So

16     that's the first argument.

17          The second argument we're making goes more to

18     where the discretion is on PMTA.  Our position is such that

19     Congress struck a balance in this statute.  This is,

20     undoubtedly, a public health statute.  But it is also a

21     statute that is consistent with the history of regulating

22     tobacco products where Congress wanted to strike a balance

23     and make sure that adults had access to tobacco products,

24     and especially ones that are potentially safer.

25          And so what our argument is is that even before we

1    get to all the PMTA and the SE stuff, that they have

2    arbitrarily prevented us from even filing the PMTAs.  And

3    that is because we don't have enough time to do those

4    studies.  There are two fixes to this.  One is simply to

5    extend the compliance period and, at a minimum, at least

6    consider that in the administrative record, which we say

7    they didn't.

8           The other one, which gets more into what I think

9    you guys were talking about, is the question did they have

10   authority to set a new grandfather date so that at least

11   some of us would remain on the market because we're

12   grandfathered; we would be subject to everything else, but

13   we wouldn't have to do a PMTA.  And some others, not all --

14          THE COURT:  I've got the grandfather date coming

15   up later.  So we will talk about that.

16          MR. GOTTING:  So those are my two arguments.

17          THE COURT:  All right.  So neither side now is

18   making the argument that you made very strongly in your

19   reply, which is that the FDA should never have said that it

20   didn't have the discretion on the premarket review issue.

21   You concede, and you're both telling me, of course it's

22   required by the statute.  Once you deem, premarket review is

23   required by the statute, period, right?

24          MR. GOTTING:  No.  I don't think I'm saying that.

25   I'm saying -- one of my arguments --

1          THE COURT:  What you're saying is that they didn't

2     consider that we might need more time in deciding whether to

3     deem or not.  But the question is once you deem, if it's a

4     tobacco product, premarket review is required per statute.

5     The FDA, in exercising its discretion to deem, didn't have

6     further discretion to decide are you subject to premarket

7     review or are you not?

8          MR. GOTTING:  So I want to make sure we're using

9     premarket review.  When I say premarket review, I mean PMTA.

10     You mean anything, like SE and PMTA, is that what you're

11     saying?  I just want to make sure.

12          THE COURT:  What I'm talking about, what's in the

13     statute.

14          MR. GOTTING:  Yes.  Yes.  I think the way the --

15     and our argument is on grandfather, that they had, actually,

16     the duty to set a new grandfather date, which means that if

17     small sub -- depends on what date they set.  A set of

18     products would not have to go through any premarket review

19     because they're grandfathered.

20          THE COURT:  Where in the statute do you find any

21     support for the argument that the FDA even could, much less

22     had to, change a date that's in the statute that Congress set?

23          MR. GOTTING:  The purposes section.  Because,

24     again, this is not purely a public health statute.  This is

25     a statute that wants to make sure that adults --

1              THE COURT:  The word "appropriate" regulatory

2      concern?

3              MR. GOTTING:  No.

4              THE COURT:  Okay.  Where's your --

5              MR. GOTTING:  There are several provisions.  The

6      first one is the adult provision.  It says we are giving

7      flexible authority to this FDA to make sure that safer

8      products have a reasonable chance of getting -- or, safer

9      products come to the market.  And secondly, that -- well, I

10     guess that's it.  That's --

11             THE COURT:  But after their preamble, when they

12     say public health, public health, public health, tobacco,

13     tobacco, tobacco, nicotine, nicotine, nicotine, FDA,

14     scientific expertise, appropriate adult, label, etcetera,

15     then they say that's our purposes, that's our findings,

16     here's our statute, here's what you have to do, Agency.  And

17     they say a new tobacco product is any tobacco product not

18     commercially marketed as of February 15, 2007.  Where in

19     that statute -- can you tell me any case where a court has

20     held that just because they use the word "flexibility" in

21     the introduction, that the agency had the authority to

22     change the language of the statute?  Isn't your problem with

23     Congress and not the agency?  And aren't you already working

24     on that right now?

25             MR. GOTTING:  We are.  There are two bills in

1    front of Congress right now.  I think what we can take from

2    *Brown & Williamson* and *UARG* and the *MCI* case is just because

3    you have something that has a natural reading -- and I

4    agree, it says --

5              THE COURT:  A natural reading?  It's the only

6    reading.

7              MR. GOTTING:  But our position is if you look at

8    those cases, that the Supreme Court says you have to look at

9    the structure and the purposes of the statute as a whole.

10   And if we don't move the grandfather date -- I think there's

11   another solution here, which is simply to consider extending

12   the compliance period.  But if we don't move the grandfather

13   date, it puts us in a position I don't think Congress wanted

14   us in, and that is where before we can even file compliant

15   PMTAs, FDA has already conceded that the vast majority of

16   these manufacturers are going to exit.  And it's our

17   position that if we can't file compliant PMTAs, we're all

18   going to have to exit in three years.

19             So I think if you look at the structure as a

20   whole, Congress was saying, Look -- and let me back up, and

21   this is another way to look at it, the purposes of --

22   obviously, the purpose here is to reduce tobacco-related

23   disease and the social costs that are associated with that,

24   particularly cigarettes.

25             One way to do that, and I think that's what

1   Congress was talking about in the purposes section, is to

2   make sure that adults have access to safer products.

3          It is our position, and they -- FDA says that we

4   are likely safer than cigarettes, that is one way to achieve

5   the purposes of the statute.  And so if we don't move the

6   grandfather date or if we don't extend the compliance

7   period, at a minimum --

8          THE COURT:  That might all be true, but I don't

9   see any legal authority for the FDA to change the

10  Congressionally mandated compliance date.

11         MR. GOTTING:  And we have cited to *Brown &*

12  *Williamson* and some of the other cases that say that where

13  that -- where reading something in isolation doesn't allow

14  you to meet the purposes of the statute, that you can look

15  to those -- you know, the broader structure.

16         THE COURT:  And just make up another date?  They

17  could just make up another date?

18         MR. GOTTING:  I think they have -- they're the

19  ones with the scientific expertise.  They can set a date

20  based on the balance, what Congress told us.  They said we

21  want to you to balance public health with adult access to

22  safer products.  And so it would be up to FDA to make sure

23  that some of those products have a reasonable opportunity to

24  come to market, whether it's by extending the compliance

25  date so we can file compliant PMTAs or moving the grandfather

1    date.

2              THE COURT:  Well, is there anybody that's going to

3    be able to move under the SE pathway?

4              MR. GOTTING:  No.  So they've said, in the

5    administrative record, no e-liquids are grandfathered,

6    therefore no SE.  And they said only 1 percent of the

7    devices may have a chance of doing SE, but we don't know

8    where that product is going to come from, the predicate

9    product that we have to point to.  They said there was some

10   e-cigar, but they don't identify who made it, they don't

11   identify what date it was on the market.  We don't know what

12   it is.  So, all e-liquids are out.  We have to do PMTA.

13             THE COURT:  All right.  Well, one of the arguments

14   you make, that it's unreasonable to regulate these products

15   based on the historical practices of the tobacco industry,

16   and so it's not fair to treat this industry based on all the

17   terrible things that the tobacco people did historically.

18   But I want to know how you can blame that on the FDA?

19   Because didn't Congress set it up that way with this statute

20   when it applied the same regimen to new tobacco products?

21   And then I just want to know, is that part of your APA

22   attack or is that just part of your Constitutional argument?

23             MR. GOTTING:  Let me -- the -- our argument is

24   that Congress set up the Tobacco Control Act to recognize a

25   continuum of risk.  And we know that because it says we want

1    adults to have continued access to safer products.  And so

2    one of the places where you see flexibility in this Act is

3    the SE process.  And the reason why you see that is because

4    the SE process is not pegged or does not require a showing

5    under the population effect standard.  It means that we do

6    not have to do those long-term studies.

7         And so our position is if you have a product that

8    is potentially safer, like we think e-vapor products are,

9    Congress would have intended for us to be able to avail

10   ourself of the SE process because there is flexibility, and

11   that's what Congress told us, they said flexibility.  And

12   that would be an example.

13        And just so you know, under the SE process we

14   still have to submit a bunch of health studies, we have to

15   do all kinds of stuff, but we don't have to do those

16   long-term studies.

17        THE COURT:  All right.

18        MR. GOTTING:  Go ahead.

19        THE COURT:  One of the things you keep pointing me

20   to, everybody loves the preamble to the statute, they love

21   the findings and they love the purposes, which, you know,

22   there's one or two that talk about appropriate regulation in

23   adults and access and flexibility and then there's like 30

24   that talk about the public health.  But one of the things

25   they say, the only way to effectively protect the public

1    health from the dangers of unsubstantiated modified risk

2    tobacco products is to empower the Food and Drug

3    Administration to require that products that tobacco

4    manufacturers sold or distributed for risk reduction be

5    reviewed in advance of marketing, and to require that the

6    evidence relied on to support the claims be fully verified.

7            Isn't Congress putting its finger on the opposite

8    side of the scale that you keep telling me it's put it on,

9    if I'm supposed to pay attention to where it put its finger?

10           MR. GOTTING:  I think there's flexibility for them

11   to get to where they want to go while still allowing us a

12   chance to file a compliant PMTA.

13           THE COURT:  All right.  You've talked about that a

14   lot and I understand that argument and I'm really -- you're

15   at a much more micro level than where I am right now on the

16   APA review.

17           So, the answer to my other question, which is

18   whether it's reasonable to apply standards that apply to

19   tobacco to vaping is part of your APA argument, as well as

20   your Constitutional argument, even though that's baked into

21   the statute?

22           MR. GOTTING:  When you stay Constitution, you say

23   First Amendment, I'm not prepared to talk about it.  But

24   yes, the idea of a continuum of risk.  And I'll let Mr.

25   Block address First Amendment and whether --

1          THE COURT:  You made a due process and equal

2     protection argument that it was unfair to treat the vaping

3     industry the same as the big bad tobacco industry.  That's a

4     Constitutional argument; Nicopure didn't make it, it's only

5     in your brief.

6          MR. GOTTING:  Oh, yes.  No -- yes, the due process

7     argument.  Yes.  What I'm saying is that --

8          THE COURT:  So what I just want to know, is that

9     unfair comparison part of your APA argument also?

10          MR. GOTTING:  Yes.  I think the continuum of risk

11     is part of the APA argument.  I think it --

12          THE COURT:  But do you not concede that it's baked

13     into the statute?  You're just saying that given the

14     purposes, the underlying purpose and structure of the

15     statute and the fact that the industries are different, they

16     should have not read the statute so literally and come up

17     with something else?

18          MR. GOTTING:  I'll give you two examples where

19     it's in the statute.  I mean, it's implied, but first they

20     had to submit a report to Congress telling Congress how they

21     were going to regulate safer products and encourage those to

22     come to market.  That is § 918.  The second statute --

23     statutory provision is they can't ban nicotine.  And if you

24     look at the legislative history, the reason is we don't want

25     all these adults who are addicted to nicotine to all of a

1    sudden not have opportunities to use nicotine-containing

2    products that are safer than cigarettes.

3          THE COURT:  But the nicotine-containing products

4    are the ones that everyone has conceded is a tobacco

5    product.  And Congress said tobacco products need to be

6    regulated in this way, and if they come on the market after

7    this date, they need to be subject to this procedure.  So

8    where does it -- I don't see the source of the flexibility.

9          MR. GOTTING:  And I'm saying that going back to

10   *Brown & Williamson*, the long history of Congressional

11   regulation of tobacco products has always struck that balance.

12         THE COURT:  It actually starts in 2009 when

13   e-cigarettes were already on the market.  Why does the FDA

14   get to change the balance that Congress struck?

15         MR. GOTTING:  I don't think they do.  I think what

16   we're arguing is the pendulum on their end has swung too far.

17         THE COURT:  All right.  Okay.  Let me -- I think

18   I'm still talking about APA review and whether there's

19   judicial review at all.  So let me get the government in on

20   that one, because we still have to talk about the

21   cost-benefit analysis.

22         So you say the word "deem" is broad, there's no

23   standards in the statute.  But you do agree that the first

24   thing we talked about, whether the statute applies to open

25   systems, I get to review?

1           MR. BECKENHAUER:  I think that's right.  And I

2     think Nicopure's counsel is incorrect to say it has to be an

3     absolute on-off switch.  I think *Webster v. Doe* points to

4     the way here.  We discuss this in our brief.  But there the

5     statute authorized the CIA to terminate employees wherever

6     the director shall deem such termination necessary.  But the

7     Court --

8           THE COURT:  Well, all the cases that you point to

9     where deem means the courts really can't get in there tend

10    to have that classified national security aspect to them or

11    they're dealing with criminal enforcement, like *Heckler*.  Do

12    you have any cases that you're relying on that are analogous

13    to the situation here?

14          MR. BECKENHAUER:  Your Honor, I don't think it's

15    true that the committed-to-agency-discretion rule is limited

16    to national security enforcement cases.  And we cited a

17    couple cases in our brief, one is *Salt Institute*, I believe.

18    But cases -- some context are FACA has said that the

19    decision whether -- courts have said in the FACA context

20    that the decision whether or not to adjourn a meeting can be

21    committed to agency discretion.  So --

22          THE COURT:  I mean, that's so different than this

23    case where they put it out for notice and comment.  We got a

24    record this big (indicating), and they made a decision that

25    they took pages and pages and pages to justify, to suddenly

1      say, well, Court can't even look at this the way it looks at

2      all agency decisions, with the deference that all the cases

3      they cite requires that I can't even look?

4           MR. BECKENHAUER:  Your Honor, I think it's

5      certainly a very different context.  But I think it well

6      illustrates the point that there is no context-specific

7      limitation on agency -- on when a matter is committed to

8      agency discretion.  I think plaintiffs attempt to sort of

9      scour the statute to find some sort of meaningful standards

10     for the Court to enforce and other provisions of the statute

11     simply proves the point that there are no meaningful

12     limitations on the agency's deeming authority in the

13     provision at issue here.

14          And I think maybe the best example of that is the

15     plaintiffs point to § 912, which of course is the judicial

16     review provision, and there the statute says that to

17     facilitate judicial review, a regulation shall contain a

18     statement of the reasons for its issuance.  But plaintiffs

19     overlook that that judicial review provision applies only to

20     § 387f, g, h, i, j and p.  It doesn't apply to 387a where

21     the deeming provision is located.

22          So I think that provides further confirmation that

23     here Congress simply didn't intend the reasons for the

24     issuance of a deeming rule to be subject to judicial review.

25          THE COURT:  Well, if I disagree with you or if I

1   decide to cover my bets and agree with you but go on anyway

2   so that I don't have to do things twice, if deeming is

3   subject to APA review, what standard applies?

4           MR. BECKENHAUER:  I think the Court is exactly

5   right, as a general matter once something is deemed, all

6   these provisions of the statute kick in.  That's just how

7   the statute works and that's how Congress wrote it.  As far

8   as plaintiffs' invocation of this sort of --

9           THE COURT:  I guess they're saying knowing that,

10  that should have informed your decision, your discretion to

11  deem or not.  So, if I'm supposed to look at your decision

12  to deem under the lens of the APA, what's the standard of

13  review that I apply?

14          MR. BECKENHAUER:  So if we're going there, I think

15  the standard is the traditional *State Farm* standard, did the

16  agency consider the relevant factors and did it explain its

17  decision in a way that wasn't irrational?  And that affords

18  broad discretion to the agency.  And, you know, two factors

19  above and beyond that, because we're dealing with a deeming

20  provision, I think that bespeaks an extra degree of

21  deference to the FDA here.

22          In addition, we're dealing with the sort of

23  scientific decision that's fully within the competence of

24  the agency's expertise.  And as Your Honor pointed out,

25  legislative findings 44 and 45, Congress made very clear

1   that the FDA is the only federal agency with the scientific

2   expertise available to review the kinds of scientific

3   studies at issue here.

4         THE COURT:  And I think you've done a lot of this

5   in your brief and some of the reasons I'm cutting off

6   questions is people with their extra long briefs have dealt

7   with a lot of these things in writing.  And as you may have

8   noticed, I've read it, and I'm going to go back and look

9   again at what you've pointed me back to.

10         But, you've landed right where they've asked me to

11   go, which is the agency says, straight up, these probably

12   aren't as dangerous as cigarettes and, frankly, we don't

13   even know yet if they're dangerous at all.  And so given

14   that, if the one thing I get to review is deem, no deem, why

15   is it reasonable to say okay, we're going to subject you to

16   this entire regulatory regime while we try to figure it out.

17   Why is that reasonable?

18         MR. BECKENHAUER:  So I think plaintiffs' answer to

19   these problems is that, in essence, e-cigarettes need be

20   regulated because they're generally less terrible than

21   conventional cigarettes.  And, I mean, I think that's pretty

22   faint praise, given that conventional cigarettes are the

23   deadliest consumer product ever to hit the market.  And by

24   that logic no other tobacco product, be it pipe tobacco,

25   cigars or e-cigarettes could be deemed subject to the

1    Tobacco Control Act.

2         So I think that mode of analysis particularly

3    faulty.  The plaintiffs are citing repeatedly FDA's

4    recognition that the overall effect of e-cigarettes on the

5    public health is unknown at this point, but they ignore

6    FDA's explanation that whether e-cigarettes themselves may

7    ultimately be shown to have a net benefit or net harm on

8    society at the population level, and there's no good

9    evidence on that at this point, regulation of them will

10   benefit the public health.  So in other words --

11        THE COURT:  Is there evidence that it has a

12   negative effect on individual health?  Putting aside the net

13   population, is there evidence in the record that there's

14   concerns about vaping and individual health?

15        MR. BECKENHAUER:  I think there's plenty of

16   evidence in the record that vaping presents significant

17   health risks to individuals.  You know, they're now used by

18   13 percent of high school students.  That's 2.4 million

19   kids.  They've replaced conventional cigarettes as the most

20   popular tobacco product.  You know, chief among the risks,

21   addiction to nicotine.  And I don't think the Court needs to

22   go further than that.  Nicotine is a psychoactive chemical,

23   it harms brain development in youth and it has addictive

24   power on par with cocaine and heroin.  That's enough.  The

25   Court doesn't need to go farther than that to find that

1     there's significant health risks with respect to e-cigarettes.

2            Plaintiffs are essentially asking the Court and

3     the FDA and the public to engage youth in this grand

4     experiment to see, you know, maybe these will turn out to be

5     less terrible than conventional cigarettes, maybe not, but

6     let's engage kids in this long-term experiment to see.  The

7     FDA reasonably exercised its regulatory judgment to bing

8     e-cigarettes within the umbrella of regulation under the

9     Tobacco Control Act.

10           All it does is place them under the same

11    regulatory regime as the products that plaintiffs themselves

12    claim are substitutes or compliments to those products.  And

13    so the notion that the FDA's reasoning here has been

14    internally inconsistent I think is quite faulty.

15           So, you know, agencies regulate all kinds of

16    consumer products that ultimately are shown to have a net

17    benefit on public health.  Drugs under the FDCA is one

18    example.  But that doesn't mean that they're not subjected

19    to reasonable regulation to mitigate any risks that they

20    present to public health.

21           So, we said this in our brief, I don't want to

22    belabor it, but, you know, saying that we don't need to

23    regulate e-cigarettes because they may be safer than

24    conventional cigarettes is like saying that there's no need

25    to regulate cars because they're safer than motorcycles.

 1          THE COURT:  You said that in your brief, so I got

 2     that analogy.  I appreciate your answer to the question.  I

 3     want to go on to the cost-benefit analysis.

 4          Mr. Block.  All right.  If, as you acknowledge,

 5     the deeming was, for the most part, certainly for all the

 6     closed systems and for any nicotine- or tobacco-based

 7     liquids even, and even open systems packaged with those

 8     liquids proper, legally proper, then why was the cost

 9     benefit analysis required?

10          MR. BLOCK:  I'm sorry, Your Honor.  Did you say

11     that I acknowledge?  Because I don't --

12          THE COURT:  We went through the list of things

13     that you were not objecting to, the fact that they are

14     tobacco products subject to this -- you're saying they

15     shouldn't have deemed them, but once you -- you didn't

16     disagree with their legal authority to deem most of

17     e-cigarettes.

18          MR. BLOCK:  Whether they have the statutory

19     authority to regulate, yes.  Correct.

20          THE COURT:  Assuming they have the statutory

21     authority to do it and they did it, why was the cost benefit

22     analysis required?

23          MR. BLOCK:  And this goes in part to what Mr.

24     Beckenhauer was just saying, Your Honor.  And there is --

25     and it's replete within the rule -- sorry.  Let me answer

1    your question directly.  It's required because -- well, it's

2    required for two reasons.  One is that FDA, in part,

3    justified its rule and said it was taking this rule on the

4    basis of the cost-benefit analysis that it did.  But we

5    think they had to do a cost-benefit analysis under the

6    Tobacco Control Act, which says that FDA is supposed to be

7    engaged -- sorry, doing appropriate regulation that

8    encompasses a consideration of the cost and benefits of the

9    rule.

10           THE COURT:  So you're basing that on *Michigan*

11   *versus EPA*?

12           MR. BLOCK:  Yes.

13           THE COURT:  And in that case the Supreme Court

14   said when the Clear Air Act authorized the EPA to regulate

15   power plants if it found that the regulation was, quote,

16   appropriate and necessary after it considered the public

17   health issues, that it was implicit in the use of the word

18   "appropriate and necessary" in that provision to have some

19   consideration of cost.

20           Now, those don't -- those words don't appear in

21   the section of the Tobacco Control Act where Congress gave

22   the secretary authority to deem.  It doesn't say deem as

23   appropriate and necessary, does it?

24           MR. BLOCK:  Well, Your Honor, that sounds like

25   you're reading a conflict between the statute as a whole

1    which says FDA is supposed to engage in appropriate

2    regulation, and deeming, which I suppose then means that

3    when they deem it could be appropriate or inappropriate,

4    they get to deem.

5              THE COURT:  But *Michigan versus EPA* didn't base

6    its decision on the fact that somewhere in the general

7    preamble to the statute the word "appropriate" showed up.

8    It based it specifically on the fact that the specific

9    provision which had been exercised had not been exercised in

10   a, quote, appropriate manner because the cost benefit

11   analysis had not been done at all.  Isn't that true?

12             You're taking it one more step to say even if it's

13   not in the provision, you can pull it out of the preamble

14   somewhere and that imposes a substantive obligation to do a

15   cost-benefit analysis.  Do you have any case law for the

16   proposition that you can pull something out of the preamble

17   and add a substantive obligation to a provision in the

18   statute?

19             MR. BLOCK:  Well, I think the Administrative

20   Procedure Act, Your Honor, requires agencies to engage in

21   recent decisionmaking and so if you want to set -- I mean, I

22   think the statutory --

23             THE COURT:  Cost-benefit analysis is just

24   implicit, period, in the ether any time an agency acts under

25   the APA, even if the word "appropriate" isn't there?

1          MR. BLOCK:  Let me answer that two ways, Your

2     Honor.  I think it's certainly present in the Tobacco

3     Control Act because of Congress's direction that FDA engage

4     in appropriate regulation.  But it's also -- has to be

5     considered as part of Your Honor's APA review because,

6     again, FDA says that deeming all tobacco -- the reason

7     they're deeming all tobacco products -- and if I may, I want

8     to make one important point about that.

9          There is no dispute in this record that there is a

10    material difference between vaping products and combustible

11    tobacco products.  The rule says that over and over again.

12    Combustible products cause the chronic disease, combustible

13    products have the carcinogens.  Deeming products, I'm not

14    says they are harmless -- excuse me, vaping products are

15    noncombustible and there are material differences.

16          The evidence is, if you go to, for example, the

17    Public Health England study, that cigarettes are a relative

18    risk of 100, vaping products 4.  The secondhand smoke,

19    the -- whatever the chemicals are that are out there, FDA

20    recognizes that the aerosol that's at sale may not pose as

21    much harm as smoke emitted from combustible tobacco

22    products.  That's 29,032 of the record.  So --

23          THE COURT:  I'm trying to get at the legal hook

24    that enables me to look at their cost-benefit analysis and

25    say no, I don't like the way you did it, I think it's

1          flawed, which is where you're getting to now, you're getting

2          to the meat of it.

3                    MR. BLOCK:  Yes.  Yes.

4                    THE COURT:  So I'm asking if there's any case law

5          that lets me derive an obligation to do it from the purposes

6          section of the statute when the provision that you're saying

7          triggered the obligation doesn't have any word in it that

8          triggers the obligation even appropriate.

9                    MR. BLOCK:  Well, I may just have to agree to

10         disagree with you on that, Your Honor, because the statute

11         as a whole says it has to be appropriate regulation.  That's

12         the same language that was in *Michigan against EPA*.  And to

13         say that --

14                    THE COURT:  It's not in the introduction in

15         *Michigan versus EPA*.  In *Michigan versus EPA* it's in the

16         exercise of the very authority.  It's in the provision.

17                    MR. BLOCK:  But -- sorry.

18                    THE COURT:  But in the purposes section it doesn't

19         even say this is a requirement, you must act appropriately.

20         It says one of the purposes of the statute is to impose

21         appropriate regulatory controls on the tobacco industry, not

22         to make sure that whatever controls you exercise are

23         appropriate.  So it's -- you know, you're reading it, and

24         again, it's just the introduction.  It's the introduction.

25                    MR. BLOCK:  Well, I respectfully submit, Your

1    Honor, there is no conflict between the way we are reading

2    the introduction and the notion that this Court should

3    review the cost-benefit analysis under the Administrative

4    Procedure Act.  But on top of that, go back to the reason

5    FDA said it was taking this action.  It said it was doing

6    this because it will result, will result in significant

7    benefits for the public health.

8              Now, to evaluate that, in part Your Honor needs to

9    look at the cost-benefit analysis that FDA has done to see

10   if that is -- to see if their prediction is right and has a

11   basis.  And here is why --

12             THE COURT:  You're saying part of my regular APA

13   review, if that is a stated reason, then I have to look at it?

14             MR. BLOCK:  Yes.

15             THE COURT:  And that's different from -- in

16   *Michigan versus EPA*, wasn't the problem that the EPA had

17   refused to consider the cost at all, and said some

18   consideration of cost is required?  Even if I agree with

19   you, that the statute required the agency to do some

20   balancing, don't you agree that they did some?

21             MR. BLOCK:  Well, did they -- here's our -- here's

22   our argument on the cost-benefit analysis:  They paid --

23   when Your Honor gives it the probing, careful inquiry that

24   the Administrative Procedure Act requires, Your Honor will

25   conclude --

1          THE COURT:  With the deference that the

2     Administrative Procedure Act requires also, right?

3          MR. BLOCK:  Certainly, Your Honor.

4          THE COURT:  Okay.

5          MR. BLOCK:  But when you do that you will conclude

6     that this cost-benefit analysis made the noises of being a

7     cost-benefit analysis, but was not a reasoned cost-benefit

8     analysis.  And I say that for two primary purposes.  And I

9     will try to be brief, and Mr. Gotting has additional

10    arguments under the regulatory flexibility analysis.  But

11    the two fundamental problems with the cost-benefit analysis

12    under the APA are if you go to the benefits side, FDA

13    acknowledges they don't know what the benefits are and they

14    say, well, we take care of that with the break-even

15    analysis.  But a break-even analysis assumes -- at a

16    minimum, assumes there is a benefit at the end of the day.

17    They don't know how to quantify it, but they assume there is

18    one.  And this very rule says, in its final regulatory

19    impact analysis at page 29,030 and -31 of the administrative

20    record, that this very rule could, under some conditions,

21    yield negative health benefits.

22          So they don't know plus or minus.  So that side of

23    the ledger, I think that makes a break-even analysis

24    inappropriate.  But the other thing is when you look at what

25    they contrasted to a benefit that may actually be, you

1    know -- sorry, if the net effect of this rule is negative,

2    then by definition the cost-benefit analysis must fail

3    because they're doing a break-even analysis to conclude what

4    additional amounts of money would people pay for the benefit

5    that the rule gets.  They're saying the rule might be

6    negative.  So you wouldn't pay an additional $2 or whatever

7    it is they say per beneficiary user per year to get a

8    negative -- would pay $2 to lose 5.

9          But on the cost side, the only cost that they have

10   considered are the quantified costs.  That's their term.

11   And there are -- it is -- this rule is replete with

12   unquantified costs that could have been quantified, which

13   include, in large part, the vast -- the exodus from the

14   market, the closing of small businesses, the cost on those

15   businesses to comply.  There's a whole litany of costs that

16   just weren't included to begin with.

17         So we respectfully submit FDA should have actually

18   tried to reach a conclusion whether there was or was not

19   going to be a benefit, and it should have compared that to

20   all of the costs, not just the ones that it wanted to

21   include.

22         THE COURT:  If I disagree with you about *Michigan*

23   *versus EPA* and whether a cost-benefit analysis was even

24   required, and I understand your point, which is if they put

25   it in there as a basis for their decision I get to look at

1    it under the APA, but putting that aside for a second, if

2    it's not required under *Michigan versus EPA*, if they

3    undertook the analysis pursuant to an executive order, do

4    you agree that that wouldn't be reviewable by this court?

5             MR. BLOCK:  No, I don't agree, Your Honor.

6    Because, again, they said that this is -- the reason they're

7    doing this rule is because it's going to have a net benefit.

8    You can't turn a blind -- I don't think the APA says ignore

9    all of the detailed cost-benefit analysis that we're doing

10   to see if we're right about our statement about the net

11   benefit.

12            So, I don't -- I don't agree.  We're not suing

13   under the executive order, we're suing under the

14   Administrative Procedure Act.

15            THE COURT:  Well, one of the purposes you keep

16   pointing me to is that this should be flexible so that

17   people can have access to these safer -- potentially safer

18   new products.  But, in -- if the purposes are important,

19   didn't Congress say the purpose of the statute is to provide

20   new and flexible enforcement authority to ensure that there

21   is effective oversight of the tobacco industry's efforts to

22   develop, introduce, and promote less harmful tobacco

23   products?  If they don't deem, where is the oversight of

24   these many, many small businesses that are out there

25   bottling all this liquid, getting it from -- some people are

1   manufacturing it themselves, some people are bringing it in

2   from China.  Where's the effective oversight that this

3   statute is supposed to promote?

4          MR. BLOCK:  So as to vaping, again, Your Honor,

5   our argument is that, in part, they didn't consider a

6   reasonable alternative to deeming because -- which would be

7   the residual rulemaking authority, to take action to gather

8   the information that they say they need in order to come to

9   the final -- you know, in order to be able to develop the

10  evidence to decide whether it really is or isn't in the

11  public health to regulate vaping products.

12         THE COURT:  As long as the agency decision is

13  reasonable, even if I might have made a different policy

14  choice --

15         MR. BLOCK:  I'm sorry?

16         THE COURT:  The question isn't what I would do

17  de novo.

18         MR. GOTTING:  Completely understood, Your Honor.

19  And we're not asking this Court to take a -- is it a blue

20  pencil out and change the rule.  Agreed.  Your Honor is

21  reviewing the rule up or down, does it comply with the

22  Administrative Procedure Act?  But it's not -- but the

23  Administrative Procedure Act requires the agency to consider

24  reasonable alternatives and explain why it's rejecting them.

25  And I respectfully submit that the agency did not do that.

1    You know, it set out -- it started with a we're going to

2    deem, and our alternatives are we're going to deem

3    everything, or we're going to deem everything except for

4    premium cigars.

5         So there's sort of a problem at the get-go.  It

6    looks like FDA never considered not deeming vaping products,

7    which is troubling, given that the rule is replete with all

8    of these reasons why vaping products, which are

9    noncombustible, are different and pose less of a health risk

10   than combustible products.

11        THE COURT:  If they're deciding to deem or not,

12   how can you say they didn't consider not?  I mean, it's part

13   and parcel of the decision, Should I do this?  If you don't

14   do it, then you're not doing it.

15        MR. BLOCK:  I guess I was trying to make the

16   point, the alternatives that they put forward are we can

17   deem everything, or we can deem everything except for

18   cigars.  That doesn't show any flexibility or consideration

19   of the need to consider flexible alternatives for vaping

20   products.  They didn't respond to the comments about using

21   other rulemaking sources so as to avoid the -- the

22   detrimental consequences of subjecting vaping products to

23   the all-or-nothing deeming approach.  And then even within

24   deeming, you know, FDA has discretion under deeming.  Mr.

25   Gotting talked about this a bit in the compliance period.

1     But they created out of whole cloth a concept of a covered

2     tobacco product versus as non-covered tobacco product.  And

3     so covered tobacco products are subject to some of the

4     statutory requirements.  But if it's not a covered tobacco

5     product, it isn't.

6          They had tailoring ability there to use with

7     vaping products and they didn't.  That's -- and you see

8     that, to come back to the cost-benefit analysis, this is not

9     limited to cost-benefit -- to our cost-benefit concerns by

10    any reason.  But the cost-benefit analysis talks about the

11    alternatives FDA considered.  And with respect to vaping,

12    the alternatives were no alternatives at all, particularly

13    in light -- they were just more onerous, or they only dealt

14    with cigars.

15          And *Allied* -- the *Allied* case I mentioned earlier

16    says under APA review agency has an obligation to consider

17    and respond to comments that suggest reasonable

18    alternatives.  And there were -- these comments were made,

19    and we respectfully submit they were not adequately

20    responded to.  FDA was -- ended up where it started.  We're

21    going to deem -- you know, our choices are deem everything

22    or not, and that's where they ended up.  And they didn't

23    explain along the way why they didn't consider the

24    flexibility and they didn't consider along the way -- they

25    said it was going to be a net benefit, but the cost benefit

1    analysis doesn't back that up.

2            THE COURT:  All right.  What's your response to

3    the FDA argument that you've misstated the record when you

4    repeat over and over again that there's going to be a

5    95 percent departure from the market?  I mean, first of all,

6    again, we're only talking about the e-liquid market.  We're

7    not even talking about the entire e-cigarette market, the

8    other two-thirds.

9            MR. BLOCK:  If I may, Your Honor, the -- I believe

10   this -- I believe my co-counsel should address this point.

11   We, Nicopure, we're saying it is undisputed that there's

12   going to be significant product exit from the market.  FDA

13   acknowledges that.  The majority of --

14           THE COURT:  And I guess part of my reasoning, I'm

15   not sure which way that cuts.  The more you talk about how

16   many people there are out there bottling and labeling and

17   selling this, not labeling it and selling this stuff and we

18   have all the statistics in the record about the massive

19   expansion of the use of these products, even if you're only

20   talking about adults, young adults, and then obviously the

21   people who shouldn't be having them at all, the minors, it's

22   kind of like the wild west out there.

23           So, yes, there's going to be effect on the market,

24   but doesn't the fact that the market is so broad and so

25   unregulated and so decentralized underscore why it might be

1     reasonable to say, Okay, you know, everybody needs to tell

2     us what's in the bottle?

3              MR. BLOCK:  Just on that very last point, Your

4     Honor, I think that the -- I would refer Your Honor to the

5     comments from the Small Business Administration.  Those are

6     FDA 082214 of the administrative record.  The -- that it's

7     not like the agency wasn't made aware of the likely effects

8     of its action on small businesses and on the public health.

9     And the SBA is focused more on the public -- I'm sorry, on

10    the small business aspect.  And, again, then they didn't --

11    all of the deficiencies that were identified by the Small

12    Business Administration in its comments to the rule, none of

13    those were addressed, corrected.  It just -- if anything, it

14    sort of got worse in the final.

15             But as to the 95 percent, it -- I'm going to let

16    Mr. Gotting address that, but it goes to -- I'm sorry.

17             THE COURT:  All right.

18             MR. GOTTING:  Just to be clear, when we talk about

19    exit, our position is we're being forced to exit even before

20    we have a chance to file the PMTA and prove to them that we

21    are a safe product.  So here's where we get the numbers:  At

22    table 4 in the RIA they say that there are 168 to 204

23    manufacturers in this country, but there are also 3,500 to

24    7,000 vape shops.  They say repeatedly in the administrative

25    record that vape shops are manufacturers because they do

1    make e-liquids, they do make devices or they modify devices.

2            So if you just crunch those numbers based on FDA

3    admission that all vape shops are going to exit before the

4    two-year compliance period, that gets us to 95 to 97 percent,

5    depending on how you crunch the numbers.  Our position is

6    that, okay, now we have --

7            THE COURT:  Do vape shops only sell open devices?

8            MR. GOTTING:  No, I would think they also sell

9    closed.

10           THE COURT:  Okay.  So why are they going to exit?

11   Why can't they sell them?

12           MR. GOTTING:  We're talking about all e-vapor

13   products right now.  We're not just talking about the device

14   versus tobacco derived from.  We're talking about all

15   devices.  And that 3,500 to 7,000 --

16           THE COURT:  The vape shops aren't the ones

17   responsible for filing all the paperwork to get the devices

18   approved.  The manufacturers have to do that.

19           MR. GOTTING:  Well, FDA --

20           THE COURT:  The large manufacturers aren't even in

21   here saying that they don't have time to do it.  They've

22   been given two years.

23           MR. GOTTING:  No, our clients include some of the

24   largest manufacturers in the country.  What FDA is saying is

25   that you have two types of vape shops.  You have vape shops

1    that both -- just retail and sell, so they're not regulated.

2    But there are vape shops that retail and also actually

3    manufacture e-liquids.  Those folks have to do everything

4    that the big manufacturers have to do.  They are fully

5    compliant -- have to be fully compliant, including those PMTAs.

6              THE COURT:  So they're going to exit the market,

7    or are they going to change their core business?

8              MR. GOTTING:  According to FDA they will -- that's

9    correct, they will exit the manufacturing sector, yes.

10             THE COURT:  So that doesn't drive mom and pop out

11   of business.

12             MR. GOTTING:  No, but it takes a substantial --

13   you know, a piece of their business away.  And because --

14   and this is so important, the compliance period is two years --

15             THE COURT:  It takes longer than that to do a PMTA.

16             MR. GOTTING:  Yes.  But another year is added

17   because they can review the PMTAs.  If they don't address

18   those, if they don't decide, and it's our position that they

19   just don't have the resources to do it, we have to remove

20   our products from the market.  When we do that, we cannot do

21   the long-term studies because the long-term studies depend

22   on those products being out on the market.  And, you know,

23   and so we can do those long-term epidemiological studies or

24   clinical studies.

25             And why that's important is that even though

1    they're going to stay as a retailer, they're never going to

2    be able to recover their markets because their products are

3    no longer there.

4              So that's the first.  So that's 95 to 97 percent

5    of the manufacturers are going to exit.  The remaining, it

6    is our position, and we've already talked about this, is

7    that they -- I think they say they're going to be hundreds,

8    if not more, PMTAs filed.  They don't estimate how many

9    would ever be approved.  Our position is that none would be

10   approved because we don't have compliant data.  We don't

11   have enough time.

12             THE COURT:  All right.

13             MR. GOTTING:  So that is when we get to 59 percent,

14   at least.

15             THE COURT:  Okay.  All right.  Thank you.

16             MR. GOTTING:  Yep.

17             THE COURT:  Let me hear from the government

18   briefly.  I think we're still on the cost-benefit analysis,

19   and then turn to the First Amendment.

20             All right.  Why is it appropriate for the agency

21   to impose the regulation -- the regulatory regime that's

22   aimed at cigarettes with the same time periods when the

23   record does appear to contain evidence indicating that

24   vaping is less dangerous?  Isn't that sort of the essence to

25   be more arbitrary?  You say, well, we're going to do exactly

1    what we did for them, even if we're talking about a

2    completely different product, without combustion, etcetera.

3              MR. BECKENHAUER:  Your Honor, I think, again, this

4    goes back to the statute that Congress set up.  So, you

5    know, back in 2009 Congress was well aware that there was a

6    range of different products on the market, with a range of

7    different risk profiles, including cigarettes, roll-your-own

8    tobacco, smokeless tobacco, and electronic devices.  And

9    Congress specifically recognized that the provisions of the

10   statute, including premarket review, would limit the access

11   to market for some of those potentially innovative devices.

12   But still, it made premarket review a central feature of the

13   statute.  The reason for that is tobacco --

14             THE COURT:  You've exercised your discretion to do

15   this two-year ramp-up.  I've been told many times this

16   morning that two years isn't going to cut it, that what they

17   have to do -- they're set up to fail.  Does the regulation

18   address that?

19             MR. BECKENHAUER:  Your Honor, I think this bleeds

20   a bit into plaintiffs' regulatory flexibility analysis

21   claims.  But I think it's certainly wrong that the agency

22   didn't fully consider the economic effects that this rule

23   would have on small manufacturers.  I don't think it's -- to

24   address --

25             THE COURT:  Big or small, if you're supposed to

1        provide long-term data, how do they do that in two years?

2            MR. BECKENHAUER:   Sure.   To address your question

3     directly, there is a robust industry of contract research

4     organizations that specialize in conducting studies to

5     present the kind of clinical data that are necessary for

6     drug approval, and the same sort of studies that could be

7     used to support approval under the TCA.   So I don't think

8     there's any reason to assume at this point that two

9     years just wouldn't be enough time for plaintiffs to amass

10    those kinds of studies.

11            In -- I mean, to step back here, we're talking

12    about the cost-benefit analysis here.   And even if

13    plaintiffs are right that cases like *Michigan* require the

14    agency to consider the cost and benefits of the rule, it's

15    clear that the agency discharged that duty.   *Michigan*

16    requires only that the agency pay some attention to cost.

17            THE COURT:   I understand the legal standard.

18    They've made the same -- they made an argument over and over

19    again that I don't think you specifically addressed.   You

20    certainly indicated why you thought it was appropriate for

21    the agency to exercise its authority to deem when it did.

22    But, they have said that wasn't the only source of your

23    authority, you probably still could have gone in and gotten

24    the -- dealt with the labeling, dealt with the ingredients,

25    dealt with all these things under the residual authority.

1    What's your answer to that specific argument?

2              MR. BECKENHAUER:  Sure.  So I think this slides

3    back a bit into their arbitrary and capricious argument.

4    And just to frame the legal issue, of course the APA doesn't

5    hold an agency accountable to every conceivable policy

6    choice.  It only holds -- it only requires the agency to

7    explain why it didn't adopt a significant alternative that

8    would have been at least as effective in obtaining the same

9    result.  So I think the sort of just gathering ingredient

10   listings is the kind of half measure that clearly wouldn't

11   be effective to achieve the same result.

12             But regardless, as for the legal authority,

13   especially in the wake of *Sottera*, I don't think the agency

14   can be faulted for relying on its tobacco-specific

15   authorities under the TCA, rather than rely on its general

16   rulemaking authority.

17             THE COURT:  All right.  Okay.  Let's see if we can

18   get the First Amendment done.

19             All right.  Back to you, Mr. Block.  Ban on free

20   samples.  It's required under the Act for all tobacco

21   products.  So if I determine that the deeming is lawful, how

22   can you challenge this aspect of the rule as unconstitutional?

23   Are you challenging this provision of the TCA itself as

24   unconstitutional?  It's not part of the rules, it's part of

25   the statute.

1            MR. BLOCK:  Well, it's -- I believe that the rule

2       subjects our products to the regulation, then that's part of

3       the Rule 21 C.F.R. 1140.16.  I'm sorry, Your Honor, your

4       question again?

5            THE COURT:  Is it your position that it's

6       unconstitutional to ban giving out free samples of

7       cigarettes, too?

8            MR. BLOCK:  I don't think I have to convince you

9       of that, Your Honor, to succeed on our challenge, which is

10      it's unconstitutional to ban the sampling of our vaping

11      products.

12           THE COURT:  But what does that?  The rule or the

13      statute?

14           MR. BLOCK:  The rule.

15           THE COURT:  Not the statute?

16           MR. BLOCK:  Well, maybe the rule in conjunction

17      with the statute.  But the agency action that's subjecting

18      us to that ban is the rule.

19           THE COURT:  The deeming?

20           MR. BLOCK:  The deeming and -- deeming and then

21      saying that we are now covered by 21 C.F.R. 1140.16, which

22      prohibits sampling.

23           THE COURT:  There's no prohibition of sampling in

24      the statute itself?  The statute just gives them the

25      authority to issue the --

1          MR. BLOCK:  If I remember correctly, Your Honor --

2     I will double-check this -- but if I remember correctly,

3     the statute directed FDA to promulgate a rule that bans

4     sampling.  But that's -- it's the rule, it's that regulation

5     that would be enforced -- that is being -- it's in effect

6     now.  We're not allowed to sample.  We think sampling is --

7     I'm sorry.

8          THE COURT:  So why is that expression -- what are

9     you communicating when you hand somebody a free sample on a

10    street corner?  Says you say sampling is essential to

11    educating consumers and obtaining immediate, spontaneous

12    feedback.  Sampling is an effective means of communicating

13    and encouraging consumers to try new and different products,

14    enable them to learn about their own preferences, possibly

15    change their purchasing behavior.  You seem to be listing

16    all of the effects, potential effects of the act of handing

17    out a free sample.  Why is the act expressive?

18          MR. BLOCK:  The act is part and parcel of the

19    communication, the information about the product.  You want

20    somebody to understand what it is, how it works.  You need

21    to get -- that's -- I mean, historically that's what

22    sampling has been, and been recognized.  You can't, sort of,

23    separate the provision of the sample of the product from the

24    communicative elements about the product.  This is why you

25    should like it, this is why you should try it --

1          THE COURT:  I'm just trying figure out --

2          MR. BLOCK:  -- this is how it works.  Sorry.

3          THE COURT:  I'm just trying to figure out what's

4    expressive about giving it away.  You say it allows sellers

5    to inform customers about a product's characteristics and

6    quality.  If that's true, then why isn't selling something

7    an expressive act?  What's the difference?  Why is it more

8    expressive when it's free?

9          MR. BLOCK:  Well, when it's -- it's a very good

10   question, Your Honor.  But, for purposes of this -- I don't

11   have to --

12         THE COURT:  I have to find it to be expressive.

13         MR. BLOCK:  You do have to find it to be

14   expressive.  What I'm saying is you can find it to be

15   expressive without deciding whether it's also expressive

16   when you're selling it, about which the cases are mixed.

17   And I think the Supreme Court has just granted cert. on a

18   case that may look at that issue further.

19         But the case law is clear that sampling is

20   expressive activity.  That's partly because of its historic

21   roots, and we cited some of this in our reply brief, it's --

22   but it is --

23         THE COURT:  I don't think the case law is quite

24   that clear.  You've got one case saying restrictions on

25   coupons and discounts, which are aimed at the exact same

1     thing, persuading consumers to our product, that they don't

2     implicate the First Amendment at all.  You've got *Discount*

3     *Tobacco* but it didn't tease out -- it had a whole array of

4     things that were being done, including giving out

5     promotional things and things that had the cigarette emblems

6     on the front of the clothes and a whole series of steps.  It

7     didn't look at the expressive nature of each one, it looked

8     at the expressive nature of the entire regime.

9          You cite *Edenfield* over and over again, and that

10    involved direct, in-person solicitation of new clients by

11    speaking to them.  So, I want to just understand what is the

12    predicate here for the First Amendment in this?

13         MR. BLOCK:  Well, in part we can look at what FDA

14    itself said in its rule.  And this is at 24,014 of the

15    administrative record.  In the regulatory impact analysis

16    they say that sampling is designed, quote, to try -- to

17    encourage customers to, quote, to try different and new

18    products, enabling them to learn about their own preferences

19    and possibly change their purchasing behavior as a result.

20    This is the message that the -- that Nicopure is

21    communicating or -- and anyone else that's sampling.

22         THE COURT:  Here's a new product.

23         MR. BLOCK:  Here's a new product, this is how it

24    works, this is why you should try it.  We would like to know

25    what you like about it, what you don't like about it.  It's

1    a very -- it is -- it is an expression of ideas.  It's not a

2    commercial transaction because it's free.

3              THE COURT:  Well, even if I assume that the

4    *Central Hudson* standard applies because there's some

5    expressive element in the act of giving somebody something

6    to try, clearly you're implying that it's good and they

7    might like it if they tried it.  And you want me to rely on

8    *Discount Tobacco City* for that very proposition.  Doesn't

9    that opinion also say that a ban on free samples was pretty

10   much a no-brainer and easily sustained under *Central Hudson*?

11             MR. BLOCK:  I don't know about a no-brainer and

12   easily sustained, Your Honor.

13             THE COURT:  It didn't use that word.  It says the

14   government's position regarding its ban on product sampling

15   is perhaps its most easily supported.  And it upheld it

16   under *Central Hudson* without any difficulty.  So even if I

17   agree with you that it's expressive, how do you survive?

18             MR. BLOCK:  Well, we think that *Discount Tobacco*,

19   which was -- we think it got it wrong in its application of

20   *Central Hudson*.  As you know, we think --

21             THE COURT:  But they got the other part right?

22             MR. BLOCK:  They did get the other part right,

23   Your Honor.  It happens.  The -- and we think that First

24   Amendment -- that the First Amendment review here should be

25   under heightened scrutiny under *Sorrell* because this is both

1     speaker- and content-based restrictions.

2              THE COURT:  What's content-based about here it is?

3              MR. BLOCK:  What you can't give; you can't give a

4     sample of the tobacco product.  We could give samples,

5     apparently, of non-covered tobacco products.  So it's

6     something specific about what it is we're sampling.

7              By definition it's, I think, it's content-based

8     and it's speaker-based because it's applying only to the

9     manufacturers, distributors, and retailers of these

10    products.  So heightened scrutiny should apply.  And whether

11    or not -- whether or not Your Honor is applying the

12    heightened scrutiny in *Central Hudson* or plain old *Central*

13    *Hudson*, it fails at the intersection, or at least at the

14    last prong as to whether the ban is not more extensive.

15             It's FDA's burden to show that the ban is not more

16    extensive than is necessary to serve its interests.  And the

17    proffered interest is in preventing youth access to the

18    products.  And we know that it's more extensive than

19    necessary because -- because the --

20             THE COURT:  Well, if youth are, as the record

21    reflects, very price sensitive and they're most likely to

22    try something that's given to them, as opposed to that they

23    have to pay for, and youth tend to congregate at concerts

24    and sporting events and the kind of places that things are

25    being given out, you don't like the idea that the regulation

1   is based on the tobacco industry playbook, but they're

2   playing by the same playbook, it seems to me, by flavoring

3   things and then giving them away.

4           MR. BLOCK:  I think I can -- we do disagree that

5   it's appropriate to rely -- they have to -- FDA has to have

6   evidence, not conjecture -- and it is just conjecture that

7   what happened in 1994 with cigarettes is the same thing that

8   would happen with vaping products.  But separate from that,

9   Your Honor, as to it being not more extensive --

10          THE COURT:  Is it really, if two-thirds of them

11  are made by the same companies?  I mean, your clients might

12  be different, but we've already established that the

13  majority of e-cigarettes are being sold by the very same

14  companies.

15          MR. BLOCK:  I do think it's -- there's no --

16  there's no record evidence that the youth -- that I saw in

17  this administrative record that youths are getting access to

18  vaping products because they're being sampled.  But even if

19  there were such evidence -- I don't think there is -- and I

20  think there would have to be on the third prong.

21          On the fourth prong, is it not more extensive than

22  necessary, we know that it's more extensive than necessary

23  because you can't get any more extensive than this ban.  No

24  sampling ever, under any circumstances, no matter what

25  controls.  There is -- but smokeless tobacco can be sampled.

1    There are restrictions; it has to be in a qualified

2    adult-only facility and you have to check ID and the like.

3    But that would be a way to have tailored the restriction to

4    get to guard against the harm that FDA is concerned about.

5              You don't have to go all the way to a blanket ban.

6    And it's FDA's burden to show that that blanket ban is not

7    more extensive than necessary.  I think, almost by

8    definition, they can't make that showing under *Edenfield*

9    because you can't get any more of a blanket ban than what is

10   in the rule.  So that's --

11             THE COURT:  Has anybody found that the blanket ban

12   on free samples of cigarettes doesn't pass *Central Hudson*?

13             MR. BLOCK:  I don't believe so, Your Honor.

14             THE COURT:  Okay.  All right.  Thank you.

15             MR. BLOCK:  But the only -- the only challenge of

16   which I'm aware was *Discount Tobacco* on that.

17             THE COURT:  All right.

18             MR. BLOCK:  The Sixth Circuit case that we were

19   talking about.

20             THE COURT:  Let me ask the government to pick up

21   right there.

22             Isn't it fair to say that the weight of the case

23   law points to the notion that given the presence of some

24   communicative aspects of a sales promotion that were in the

25   world of *Central Hudson*, that I have to treat this as

1    expression?

2          MR. BECKENHAUER:  I think plaintiffs, again, point

3    primarily to *Discount Tobacco*, but I don't think it's

4    persuasive on that particular issue.

5          THE COURT:  Doesn't really deal with it head on.

6          MR. BECKENHAUER:  Exactly.  And since the

7    government prevailed under *Central Hudson*, there was no need

8    for the government to seek further review of that issue.

9    But what the court in *Central Hudson* held was that sampling

10   encourages switching from competitor's brands.  But that's

11   an outcome, it's not a message.  It certainly doesn't

12   distinguish sampling from other kinds of pricing tools, like

13   coupons or discounts that have the same effect.

14         So, you know, the Supreme Court's consistently

15   differentiated between restrictions on expressive conduct on

16   the one hand, which merit First Amendment protection, and

17   restrictions on economic activity and non-expressive conduct

18   on the other, which don't.  And I think the ban on the

19   distribution of free samples squarely falls into the latter

20   category.

21         THE COURT:  Like a coupon?

22         MR. BECKENHAUER:  Correct.  I don't think it's any

23   materially different than a coupon.  And I think that's

24   perhaps best illustrated in the Supreme Court's decision in

25   *Liquormart*, which made clear that setting minimum prices

1    doesn't implicate the First Amendment.  And that's a point

2    that was made repeatedly by several justices throughout the

3    course of their opinions.

4            So Justice Stevens in his plurality opinion said

5    that for four justices.  And Justice O'Connor in her

6    concurrence said it for another four justices.  Justice

7    Thomas said the same thing.  So I think it's very clear that

8    those kinds of pricing tools don't implicate the First

9    Amendment.

10           THE COURT:  Well, it seems like a lot of courts

11   have noted that there's some sort of distinction between a

12   coupon and giving away free samples, or a discount and

13   giving away free samples.  They don't explain what it is,

14   but they seem to acknowledge that one exists.  So, there's

15   no case that has explained what the difference is and why

16   one is purely economic and one isn't.

17           MR. BECKENHAUER:  I think that's right.  It's

18   certainly hard to tease out what the basis for that

19   distinction is.  You know, *Discount Tobacco* made the

20   distinction, but some of the other cases that made the

21   distension didn't necessarily -- you know, they sort of said

22   this case doesn't raise the question of free samples, so we

23   don't need to address.  And those are the *Tobacco Outlet*

24   cases.  So I don't think those are firm support for

25   plaintiffs' position.

1         THE COURT:  So if, again, even if I think it's

2   non-expressive, I have to go on -- I go on to deal with

3   *Central Hudson* anyway.  Or if I agree that it's expressive,

4   then I go on to *Central Hudson*.  Where in the record is the

5   factual support that ties the free samples to the concerns

6   about minors?  And what's your response to their argument

7   that this is overbroad if you can deal with other kinds of

8   dangerous tobacco products in other ways?

9         MR. BECKENHAUER:  Sure.  So I think it's clear

10  that free samples are a tried and true means for youth to

11  access harmful and addictive products.  The Institute of

12  Medicine reported as much back in 1994.  And I don't think

13  kids today are that different from kids back in 1994.  And

14  here the record shows that history is repeating itself.  As

15  Your Honor noted, the record demonstrates that e-cigarette

16  manufacturers are handing out free samples at youth-

17  frequented events; concerts, music festivals, motor sports.

18  You know, various sports events.

19         So, you know, plaintiffs particularly claim that

20  there's a lack of evidence that e-cigarettes in particular

21  were intended to fall into the hands of kids, or did

22  actually fall into the hands of kids.  But the First

23  Amendment doesn't require an agency to turn a blind eye to

24  historical experience and to common sense.  I think we see

25  that in cases like *Hutchins* in the D.C. Circuit which said

1    that a city, in considering whether to impose a curfew,

2    could reasonably look to the experiences of other cities

3    that are reasonably thought to be relevant.

4              And Supreme Court said in *Florida Bar* that even

5    under strict scrutiny under the First Amendment a government

6    can look to studies or anecdotes in other locales and can

7    rely on history and common sense.

8              THE COURT:  What's the answer to their claim that

9    it doesn't -- it violates the First Amendment because it's

10   not tailored enough?  You didn't just say don't give them

11   out at concerns, you said don't give them out at all, and

12   surely they should be able to give them out in a vape shop

13   to somebody who has an ID.

14             MR. BECKENHAUER:  So *Discount Tobacco*, of course,

15   rejected that argument.  It found that this is a narrow fit

16   between the harm articulated and the restriction employed.

17   And I think that's right.  So, for one reason, it leaves --

18   the restriction here leaves open ample alternative channels

19   of communication.  It doesn't interfere with plaintiffs'

20   ability to communicate about their products with consumers

21   through demonstrations, promotions; doesn't stop them from

22   offering significant discounts on the kind of sample kits

23   that -- rather, starter kits that they now offer on their

24   websites.

25             So there are a number of other channels by which

1       plaintiffs can communicate with their consumers.

2              And again, beyond that, it's clear under the case

3       law that the significant tailoring or appropriate tailoring

4       required under *Central Hudson* is an intermediate scrutiny.

5       It's not strict scrutiny.  It's not least restrictive means,

6       and it doesn't require a perfect fit, it just requires a

7       reasonable one.

8              So, plaintiffs say, for example, that, you know,

9       we should be allowed to distribute, you know, publicly, if

10      not at concerts or baseball games.  But, that would present

11      the same kind of problems with youth access that are present

12      in other public spaces.  So, imagine if a retailer or

13      manufacturer wanted to distribute samples in D.C., they

14      might go to Metro stations or to Union Station or to

15      Chinatown at the corner of 7th and H or to the mall at

16      Pentagon City.  We all know that those are areas that youths

17      frequent.

18             And so as the Institute of Medicine found, that

19      the kind of areas that are crowded, where there's a lot of

20      outstretched arms and its easy for youth to obtain these

21      samples, and we know that youth are particularly susceptible

22      to experimentation, especially when it's at no cost to them

23      and they don't have any skin in the game.

24             THE COURT:  Okay.  All right.  Let me go on to

25      that it violates the First Amendment to subject e-cigarette

1    advertising to the rules for modified risk tobacco products.

2         You complain in your brief and in your reply that

3    the law prohibits you from making statements that the liquid

4    doesn't contain a particular substance, any substance.  You

5    say it prohibits manufacturers from informing consumers

6    what's not in their products.  Where exactly does the rule

7    say that or the statute say that?

8         MR. BLOCK:  I have the wrong book, Your Honor.

9    Sorry.  The -- let me get to the right page.

10        So the rule -- bear with me one moment, Your

11   Honor.  The rule says that you -- for example, if a vaping

12   manufacturer wants to say that its product doesn't have tar

13   or smoke, that that -- it can't do that unless it goes

14   through the -- gets approval from FDA under the modified

15   risk provisions.  So -- and I will find the page in the rule

16   where it says that, but it may take me a second.

17        THE COURT:  The statutory provision that you can't

18   market a modified risk product unless it's been shown to be

19   effective only applies to modified risk tobacco products,

20   right, which are tobacco products that are sold or

21   distributed to reduce harm or risk of disease associated

22   with commercially marketed tobacco products.

23        MR. BLOCK:  Right.

24        THE COURT:  So why are we talking about peanut

25   butter and saying does not contain peanuts because that

1    claim doesn't have anything to do with saying this

2    diminishes the risk of tobacco related disease.

3             MR. BLOCK:  Well, that was -- okay.  Your Honor,

4    that was an example of the notion that you can't make a

5    truthful statement about your product without at least

6    potentially being subject to the --

7             THE COURT:  They don't say you can't make any

8    truthful statement about your product without proving that

9    it's true.  The only ones they ask you to get approval for

10   are statements that say this diminishes a tobacco-related

11   risk.  They don't say you can't say -- you're allowed to say

12   it's free of something else.

13            MR. BLOCK:  Well, okay.  So the point being but

14   we're not allowed to say it's free of ash or free of tar.

15            THE COURT:  Well, okay, but then why did you give

16   me a hypothetical that isn't covered by the statute at all?

17            MR. BLOCK:  Well, I -- I'll go back to what they

18   told me first year at West Point, Your Honor:  No excuse,

19   Your Honor.

20            THE COURT:  All right.  So let's take peanut

21   butter off the table and let's get back to you're not

22   allowed to say that this is no tar, no this, no that --

23            MR. BLOCK:  Right.

24            THE COURT:  -- unless it's true.  So --

25            MR. BLOCK:  Well, not even -- I'm sorry, Your

1    Honor.  It's more than that.  Unless it's true -- well, I'm

2    sorry.

3              THE COURT:  Unless you get pre-approval.

4              MR. BLOCK:  Unless you get pre-approval.  And to

5    get pre-approval, it's not just that you show that it

6    doesn't have tar, but you have to show not only does it not

7    have tar, but that that means that it is or isn't -- you

8    know, that means that it is safer than other products that

9    are on the market with the population effects and the

10   whole -- so you have to go well beyond the statement you

11   want to make.

12             THE COURT:  Well, the statute says that the

13   secretary is permitted to approve a label if all it does is

14   say that this doesn't contain this substance or that

15   substance.  Specifically says you can do that.

16             MR. BLOCK:  Well, the rule says that in order to

17   do that you have to go through the -- go through and get the

18   MT -- M -- modified risk tobacco product, make that showing

19   and get that approval.

20             THE COURT:  Right.  But, I mean, you can get

21   approved if all you're saying is does not contain X.

22             MR. BLOCK:  I don't know.  That's -- it's not what

23   the rule seems to say that FDA's view is.  FDA's view is if

24   you're making a statement that your product doesn't contain

25   tar or it doesn't produce smoke, that that is -- that in

1    there is implying that it's safer than other things.  And

2    you have to go through and do studies to demonstrate not

3    only does it not have the tar, but that it is safer in order

4    for you to be allowed to market it that way.

5              THE COURT:  And tell me the specific provision in

6    the rule that says that?  Because the statute definitely

7    doesn't say that.

8              MR. BLOCK:  That is -- sorry, Your Honor, let

9    me -- I had it here.  Can you give moment, Your Honor, and

10   I'll come back to that?

11             THE COURT:  Yes.  And is it a content-based First

12   Amendment violating restriction to say you have to

13   demonstrate that something is true before you say it, if

14   we're talking about commercial speech?

15             MR. BLOCK:  Well --

16             THE COURT:  Are you allowed to make false claims

17   under the First Amendment commercially?

18             MR. BLOCK:  Well, I think there is a -- I mean,

19   there is a prior restraint aspect of what's going on here.

20   But it isn't just -- and that's why I have to get you the

21   citation.  But it just isn't just that you have to establish

22   that it is true, you have to go beyond that and -- sorry.

23   Just fumbling for my pages here, so --

24             THE COURT:  All right.

25             MR. BLOCK:  One of the hazards of it being a big

1    rule.  Bear with me one second.

2              (Pause.)

3              MR. BLOCK:  I'm at page 28,987 of the rule, Your

4    Honor.

5              THE COURT:  Okay.  I'll look at that.

6              MR. BLOCK:  Where it's talking about -- where

7    comments noted that the rules in § 911 of the Tobacco

8    Control Act to which the vaping products are now subjected,

9    including Nicopure's products, would violate the First

10   Amendment if it bans descriptions of e-cigarettes that

11   they're smokeless, they're smoke-free, or no tar.  And FDA

12   says, well, that's not a problem because we think that those

13   sorts of statements have to go through the § 911 process.

14   And then § 911 of the TCA goes beyond just demonstrating

15   that your product in fact does not have tar or produce smoke

16   and requires significantly broader findings and

17   demonstrations.  You have to show that saying that it

18   doesn't have smoke, is expected to benefit the health of the

19   population as a whole, taking into account both users of

20   tobacco products and persons who don't currently use tobacco

21   products.

22              So we think that is -- we think that's content-

23   based, we think it's speaker-based, and we think that the --

24   again, it is more extensive than is necessary under the

25   *Sorrell* or *Central Hudson* tests.

1          THE COURT:  Well, you say this is effectively a

2     prohibition because modified risk applications have not been

3     approved in the past.  But if those applications related to

4     cigarettes and your whole premises is that these nicotine

5     delivery devices are different from and way safer than

6     cigarettes and what you want to say about them is true, why

7     should what happened in the past necessarily happen to you?

8          MR. BLOCK:  And I think the record reflects this,

9     Your Honor, the only modified risk application that's

10    ever -- I think I have this right -- that's ever even been

11    accepted for review is not for a cigarette, it's for the

12    Snus.  That's the only product FDA has ever approved a PMTA

13    for.  It's a smokeless tobacco pouch and -- by the way, FDA

14    says it's okay to say smokeless tobacco is smokeless, but

15    not a vaping product, even though a vaping product doesn't

16    produce smoke.

17         And the Snus was sold in Europe for decades and

18    they had years and years and years of the studies, and even

19    then it has not been -- they haven't agreed that they can

20    make the statement.  I forget the exact statement that Snus

21    wants to make about the contents of its product and the

22    expected -- sorry.  I'll leave it there.

23         THE COURT:  Well, I mean, again, are you telling

24    me that the rule is unconstitutional or the statute is

25    unconstitutional?  Because Congress said in the preamble,

1    which you all like, it is essential that the Food and Drug

2    Administration review products sold or distributed for use

3    to reduce risk or exposures associated with tobacco products

4    and that it be empowered to review any advertising and

5    labeling for such product.

6            It's also essential that manufacturers, prior to

7    marketing such products, be required to demonstrate that

8    such products will meet a series of rigorous criteria and

9    will benefit the health of the population as a whole, taking

10   into account both users of tobacco products and persons

11   would do not currently use tobacco products.

12           So Congress, with that in mind, passes the section

13   that says if you're a tobacco product and you want to say

14   modified risk, you got to get pre-approved.  So I just want

15   to know, am I saying that Tobacco Control Act is

16   unconstitutional?  Is that your argument?

17           MR. BLOCK:  I think we're making an as-applied

18   challenge to this rule as to vaping products, Your Honor.

19   Because we say we -- we say our products don't have tar,

20   they don't have smoke.  This rule says you can't do that

21   anymore unless you go through § 911.  So maybe -- I guess

22   maybe the way to say it, that's an as-applied challenge to

23   the statute to which we're now subjected because of the rule.

24           THE COURT:  Okay.  Let me hear from the government

25   briefly on this.  We've already talked about the grandfather

1    date, which I was going to do next.

2              MR. BLOCK:  Your Honor, can I -- tell me when the

3    right time to mention this, but I need to raise with you the

4    issue of the two-thirds of the products are cig-alikes and

5    whether that's actually in the record, because I don't --

6              THE COURT:  It's not in the record?

7              MR. BLOCK:  No.  Do you want me to do that now or

8    later?

9              THE COURT:  You just told me.  It's not in the

10   record.

11             MR. BLOCK:  Right.  And, sorry, just in their

12   brief, the citation that FDA makes to it is to a non-record

13   publication.

14             THE COURT:  Okay.  But do you agree it's some

15   substantial portion of the market?

16             MR. BLOCK:  It's -- I think it's substantial.  I

17   actually think the majority of the market is the open system

18   and it's the -- that's got a lot of appeal to the adult

19   consumers of the product, to be able to choose what --

20   exactly which flavors you use with which devices.  So I

21   think it's actually more -- actually more folks are doing

22   the open.  But as I said, the market is evolving.

23             THE COURT:  If you cut that off at age 30 or age

24   25 or age 40, does that proportion change dramatically?

25             MR. BLOCK:  I'm sorry?

1          THE COURT:  Is the proportion of young people much

2     higher than the proportion of people over a certain age?

3          MR. BLOCK:  Who are using vaping products?

4          THE COURT:  The open systems with all the

5     flavoring and all that kind of stuff.

6          MR. BLOCK:  Oh, I'm not aware of any evidence that

7     says that, Your Honor.  And in fact, the rule says --

8     although it says a lot of -- obviously, FDA is focused on

9     concerns about flavors.  The rule acknowledges that the

10     flavors are helpful and attractive to adult consumers who

11     are seeking to move from combustible products, move off of

12     combustible products.  So I think even the rule acknowledges

13     that there's nothing immorally legal or improper about

14     having flavored vaping products.

15          THE COURT:  Okay.  All right.  From the

16     government.  Seems to me that the modified risk approval

17     issue is statutory.  They are pointing to the rule and

18     suggesting that the rule requires more than the statute

19     requires, is that correct?

20          MR. BECKENHAUER:  I don't think that's right, Your

21     Honor.  Now that e-cigarettes are deemed, they're subject to

22     Chapter 9 if the Tobacco Control Act.  That includes § 911

23     of the FDCA, which governs the modified risk provision.  And

24     the requirements we're talking about here are imposed by

25     Congress, not the FDA.

1          THE COURT:  That doesn't eliminate, I suppose, my

2     need to determine whether they're constitutional or not

3     though, is that correct?

4          MR. BECKENHAUER:  Fair enough.

5          THE COURT:  But if it's a problem, it's a problem

6     for everybody, cigarettes and e-cigarettes, is that right?

7          MR. BECKENHAUER:  I think that's exactly right,

8     Your Honor.

9          THE COURT:  Has it been challenged under the First

10    Amendment for cigarettes?

11         MR. BECKENHAUER:  In *Central Hudson*, Your Honor.

12    And *Central Hudson* sustained the provisions -- sorry.  In

13    *Discount Tobacco* the provisions were sustained under *Central*

14    *Hudson*.

15         THE COURT:  Under *Central Hudson*?

16         MR. BECKENHAUER:  Correct.

17         THE COURT:  And has nobody gotten to this really,

18    other than *Discount Tobacco*?  Seems like the tobacco

19    manufacturers would have challenged a lot of this.  They

20    just didn't?

21         MR. BECKENHAUER:  To the best of my knowledge,

22    *Discount Tobacco* and, of course, the district court decision

23    below that are the only decisions to address this.  But, you

24    know, maybe it's not such a surprise that tobacco manufacturers

25    haven't challenged this because the requirements -- you

1    know, there's -- the notion that tobacco manufacturers

2    should be required to provide evidence for health claims

3    that they're making about their products shouldn't be a

4    controversial one.  Of course, these provisions were enacted

5    in the wake of a decades-long fight against the harms of

6    tobacco-related disease, and there's a clear history here of

7    the tobacco industry making, unfortunately, misleading

8    claims about the safety of their products.

9         THE COURT:  What's the response to but you've

10   never approved one of these before, so you're not going to

11   let us say it either?  They're saying that no modified risk

12   product approval has ever been granted.

13        MR. BECKENHAUER:  Unfortunately, I'm not sure what

14   the data shows on that.  But I do know that the denial of an

15   application under the modified risk provisions is

16   separately -- is subject to separate judicial review.  So I

17   don't think there's any reason here to prejudge the FDA's

18   decision on some of these products.

19        If I could, Your Honor, just to address

20   plaintiffs' last point about the -- what the record shows

21   about the composition of the tobacco industry and the

22   e-cigarette industry.  This is, of course, the first time

23   we've heard any objection to how the government

24   characterized that industry.  It was set forth in our

25   opening brief, it's on page 9, footnote 2.  It cites a law

1    review article, which are commonly cited in briefs.  It also

2    cites a scientific study, the Grana, et al. study in 2013

3    which discussed big tobacco e-cigarettes divisions.  So I

4    don't think it's controversial that --

5              THE COURT:  Is there anything in the record

6    underlying the rule that talks about the distribution in the

7    market of closed systems versus open systems?

8              MR. BECKENHAUER:  I'm not sure that the rule

9    characterizes it, but I don't think it's controversial that

10   big tobacco companies have acquired a number of e-cigarette

11   manufacturers.  I think they see that this is the direction

12   the market is going, that's why they've made such a big

13   investment, particularly in cig-alikes.

14             THE COURT:  All right.  I think I need to hear

15   from counsel again for the Right to be Smoke-Free.  And when

16   you've been talking to me about the insurmountable burdens

17   of the approval process, are you talking about the modified

18   risk approval process, or are you talking about the

19   premarket approval process?

20             MR. GOTTING:  Premarket.

21             THE COURT:  You are using lots of acronyms.  I

22   want to be clear what you're talking about.

23             MR. GOTTING:  PMTA, yes.  I am not speaking to the

24   modified risk, although they are somewhat similar.  But,

25   yes, the -- we are talking about the population effect

1     standard under the PMTA process.

2              THE COURT:  All right.  Well, we've talked about

3     the grandfather state and whether that can be changed or

4     can't be changed.  You made an argument that if the Act

5     didn't require a different grandfather date, well, then it

6     violated substantive due process.  And the complaint said it

7     violated the equal protection clause and the due process

8     claim, but your summary judgment doesn't mention the equal

9     protection argument, which means you've abandoned it.  And

10    your joint reply regulates the due process argument to a

11    footnote.  So are you still pressing the Fifth Amendment

12    claims?

13             MR. GOTTING:  Yes.  And I think what it

14    illustrates is -- and we cited the three cases that stand

15    for the proposition that whether it's Congress or a state

16    legislature, there has to be a rational relationship between

17    means chosen to achieve the goals, and whether or not they

18    actually get you there or have -- can get you there.  And

19    again, I don't want to belabor this --

20             THE COURT:  Why wouldn't it be rational, since

21    even your brief indicates that the majority of these liquids

22    have nicotine in them?

23             MR. GOTTING:  Remember, our argument is that --

24    that specific argument isn't that they can't regulate, our

25    argument is that if they don't move the grandfather date --

1    so let's say Congress didn't allow them to do that, it is

2    irrational because it puts us in a situation where even

3    before we file that PMTA, we don't get the data.  And

4    Congress couldn't have intended that because they wanted

5    adults to at least have a shot at this stuff.  But we're not

6    going to even have a chance to follow compliant PMTAs.  That

7    is irrational.

8            THE COURT:  Well, I don't understand, if no one

9    else is here telling me that people are not even going to

10   have a shot at getting an e-cigarette, that they're just

11   going to disappear in the two years that you have to file

12   these applications, and big companies aren't going to be

13   able to get it done, that Nicopure isn't going to be able to

14   get it done.

15           MR. GOTTING:  I mean, we've explained, and this

16   goes to our RFA argument as well as the APA argument, what

17   we think under the APA and the RFA they should have done,

18   and they had a duty to do this --

19           THE COURT:  I don't want to talk about the APA.

20   I'm talking about the Constitution.  Where is your liberty

21   or property interest that it was unconstitutional for -- we

22   now have to talk about Congress and not the agency, to

23   treat --

24           MR. GOTTING:  I understand.

25           THE COURT:  -- electronic nicotine delivery

1    systems differently than conventional nicotine delivery

2    systems?

3         MR. GOTTING:  That really isn't our point.  Our

4    point is it is unconstitutional to require us to spend

5    millions of dollars on studies when they're not going to

6    make any difference because we're not going to, basically,

7    have time to complete them before we're off the market.

8         THE COURT:  Well, that doesn't violate the equal

9    protection clause.  Or you haven't argued that it does.  How

10   does it violate the due process clause?

11        MR. GOTTING:  So what the cases have said, and the

12   ones we've cited to you, is that under the due process

13   clause you have to have a rational relationship between the

14   means chosen and the goals of the statute.

15        THE COURT:  Well, it says -- the Supreme Court

16   said if there's any reasonably conceivable state of facts

17   that could provide a rational basis.

18        MR. GOTTING:  So again, going back to the balance,

19   certainly protecting public health, but also making sure

20   that adults have reasonable access to these products.  And

21   so I'm not saying if we put a product in the PMTA, that if

22   it's dangerous and it doesn't pass that test, we're saying

23   it goes to the market; we're saying that we have to have a

24   chance to at least tell FDA and show them and prove to them

25   that that's the case.  And I don't think Congress ever --

1    or, we're talking about due process -- if they designed a

2    statute that doesn't allow us to get to that point, that is

3    irrational.

4           THE COURT:  All right.  Now, you've also argued

5    that the Regulatory Flexibility Act requires a longer

6    compliance period.  The FDA, it seems to me, seems to have

7    engaged in some flexibility and sensitivity to the burdens

8    that this regime could impose by baking in the two years.

9    And you're saying that's not flexible enough, you need more

10   time.  And so does the Act give me the authority to rewrite

11   their choice?

12          MR. GOTTING:  No.  You would only remand for them

13   to consider what we believe -- we don't think they

14   considered any significant alternatives, but we proposed one

15   and we believe they had a duty to consider it.

16          THE COURT:  Consider the alternatives, or just

17   consider your argument that we're not going to be able to

18   get this done?

19          MR. GOTTING:  So the RFA is a gloss over the APA

20   under § 611 of the RFA.  Under the APA whenever you make a

21   significant comment, which we did -- I mean, we're saying

22   we're not going to be able to file these studies -- that

23   they have to address, meaningfully address that comment.

24   And I can cite to you, the one case is a *District Hospital*

25   case, the D.C. Circuit.  Agencies must consider significant

1    and viable and obvious alternatives.  And then the *BNSF*

2    case, that's the railroad BNSF, says -- I think that we

3    cited to that -- that you have to respond meaningfully to

4    objections.

5            So, what they did in the record, whether it's in

6    the RFA or it's in just the preamble, is they said we

7    acknowledge you've made that comment, and our only response

8    is that some day you are going to build in some efficiencies

9    here because you're going to be able to point to public

10   records, whether it's a public docket or what they call

11   master files, and you don't have to do the studies.  My

12   clients can point and say someone else did the study, I'm

13   going to rely on that.  Great.  Saves money.

14           The problem is FDA has admitted repeatedly that

15   there are no studies for the population effect standard.  So

16   what we wanted to see in their final -- in their preamble is

17   to address the two-year and whether that was sufficient.

18   So, the questions would be:  How long does it take to do a

19   protocol?  How long does it take to recruit people for a

20   clinical study?  How long does it take to meet with FDA,

21   which they always want us to do, to get their, kind of,

22   blessing, which is fine, that's a good thing.  We don't want

23   to spend millions of dollars without their blessing.  How

24   long does it take to do those studies?

25           These are longitudinal studies that look at two

1    issues:  Initiation and cessation.  Their own longitudinal

2    study that they are doing to help them kind of support their

3    work under the Tobacco Control Act called PATH is already

4    five years into that process.  Not two years; five years.

5    And they are looking at the same things we are:  Initiation,

6    cessation, consumer behavior, comparing e-vapor products to

7    other products.  That's what we have to do.

8            THE COURT:  Are you telling me that the industry

9    hasn't already started doing this?  Hasn't been doing this

10   on an ongoing basis already?

11           MR. GOTTING:  It's a good question.  But we've

12   talked today how fast this changes.  I think it's too much

13   to have asked us to do those studies, you know, three years

14   or four years ago because we didn't know if they would be

15   deemed and, if so, when.  The products that were on the

16   market in 2011 are not the products that were on the market

17   in 2013, which are not the products that are on in 2015.

18           THE COURT:  Which way does that cut?  Does that

19   cut for more oversight, or just standing back and watch?

20           MR. GOTTING:  Well, I don't think we're standing

21   back and watching.  They didn't issue their guidance

22   document until they issued this rule, and it's a draft

23   guidance document on how to do those studies.  It would have

24   been complete speculation on our part on how to do those.

25   And remember, it's every product with every manufacturer.

1    This isn't just we could hire some academics at Harvard to

2    do this study.  We have to do it, each one of us has to do

3    it unless we can point to something else, and that something

4    else doesn't exist.

5            THE COURT:  All right.  Thank you.

6            Let me hear from the government on that.  I think

7    he summarized pretty clearly what his Regulatory Flexibility

8    Act problem is, and this also goes to the APA argument that

9    the longitudinal studies are just impossible to accomplish

10   within the time period.

11           MR. BECKENHAUER:  Thank you, Your Honor.  And if I

12   could, before I address that, there was just something I

13   wanted to flag in the full interest of candor about the

14   modified risk provision.  So, plaintiffs have spun out this

15   hypothetical about peanuts and, you know, we don't think the

16   Court needs to address that issue, as we've said before

17   today.  Again, you know, I think the plaintiffs --

18           THE COURT:  You provided some other pathway under

19   which it would be approved.  But I just don't understand why

20   it falls under the modified risk at all.

21           MR. BECKENHAUER:  Sure.  So, you know, I think

22   it's hypothetically possible that some claims like that

23   could fall within the plain text of the statute.  Again,

24   this is the statute that Congress wrote.  This isn't the

25   rule that the FDA wrote.  But, it's possible that a claim

1    like -- you know, peanut-free could fall under the modified

2    risk provision, so --

3              THE COURT:  I tried to read it a lot of different

4    ways and I couldn't get there.  But, okay.

5              MR. BECKENHAUER:  So we're in FDCA § 911, of

6    course, 21 U.S.C. 387k.  And so subsection (b)(1), of

7    course, sets out the definition of a modified risk product.

8              THE COURT:  Right.

9              MR. BECKENHAUER:  And the general definition is

10   whether it's sold or distributed for use to reduce harm or

11   the risk of tobacco-related disease associated with

12   commercially marketed tobacco products.  And then that

13   phrase is defined as including whether the labeling or

14   advertising represents that it does present a reduced risk

15   of disease or it contains a reduced level of a substance or

16   is free of a substance.

17             THE COURT:  But they're under -- that's

18   including -- all right.

19             MR. BECKENHAUER:  Exactly.  So my point there is

20   just that the claim that it's free of a substance could fall

21   under the modified risk provisions.  But if the claim is

22   only that it's free from a substance, then the analysis

23   proceeds under subsection (g)(2), not (g)(1).

24             THE COURT:  I think it's a really stretch reading

25   of the statute, given the fact that that is -- falls under

1     the definition that we've got.  But I appreciate the fact

2     that you want to alert me to the possibility that

3     plaintiffs' argument had some basis in the statute.  So I

4     think that's very commendable.

5              MR. BECKENHAUER:  Thank you, Your Honor.  And to

6     be clear, we don't think the Court needs to reach it

7     because, of course, here plaintiffs are focusing their

8     challenge on things like contains no smoke, contains no tar,

9     contains no ash.  And it's clear under the statute how those

10    kinds of claims should be analyzed.

11             But turning back to plaintiffs' regulatory

12    flexibility analysis claims.  So, of course the

13    regulatory -- the Regulatory Flexibility Act requirements

14    are purely procedural.  They don't require a particular

15    substantive outcome, particularly not one that's at odds

16    with the agency's policy priorities.  So here I think it's

17    clear that the agency discharged its requirements under the

18    act.  It responded to significant issues raised by the

19    public comments and described why each of the four

20    significant alternatives it considered in the regulatory

21    flexibility analysis were rejected.  So --

22             THE COURT:  Well, he says -- and, you know,

23    obviously I'm going to have to reread what he said.  But his

24    basic position is you didn't really actually address the

25    fact that your own longitudinal studies have taken more than

1   two years, and that they're not there and they don't exist

2   and they can't get them done in time.

3            MR. BECKENHAUER:  So, and this goes to their

4   comments, or to some -- to comments from some in the

5   industry that a two-year compliance period is simply too

6   short.  And, of course, the FDA received comments on both

7   sides of that issue.  There were, of course, some members of

8   industry who said we need longer to -- or, would like longer

9   to conduct some of these studies.  Of course, on the other

10  side of the issue, others argued that two years is too long,

11  that there shouldn't be a compliance period because that

12  jeopardizes the public health.

13           So I think we have to remember here that Your

14  Honor said this has been the wild west, and I think there's

15  an element of truth to that.  Currently on the market there

16  are between 640 and 800 e-cigarettes devices.  There are

17  between 4,000 and 8,000 e-liquids, and we largely don't know

18  what the constituents of those products are.

19           So I think it's clear and, you know, FDA came to

20  this conclusion, that extending the compliance period could

21  potentially jeopardize the public health.  So it navigated

22  this issue and reached a compromise dealing with comments on

23  both sides of the issue.  And clearly, the Regulatory

24  Flexibility Act doesn't require it to adopt a substantive

25  outcome that's at odds with its policy priorities.

1          One other point I'll make very quickly is that,

2     you know, plaintiffs have pointed to the supposed need for

3     long-term studies.  And I think it's important to note that

4     it's not the case that premarket applications will

5     necessarily need the kinds of rigorous, randomized clinical

6     trials that are more characteristic of new drug applications

7     under the FDA -- pardon me, under the --

8          THE COURT:  You've issued the guidance of what has

9     to be in a premarket approval.  Is there or is there not a

10    requirement of a longitudinal public health study?

11         MR. BECKENHAUER:  Certainly those applications

12    will often need to include clinical human data.  And the FDA

13    has explained that and this is set forth in page 13 of our

14    reply.  But we don't think there's a basis to, again, judge

15    at this point that two years is just absolutely too short.

16    For example, Nicopure itself says on its website that

17    they've known that the deeming regulation was coming for a

18    long time and they were prepared to meet its requirements.

19    And manufacturers have known since at least 2010, when

20    Sottera came down, that there was a potential for

21    e-cigarettes to be regulated.

22         THE COURT:  Has anybody submitted an application

23    or is everybody waiting for this case to be over?

24         MR. BECKENHAUER:  My understanding is that some

25    manufacturers have submitted premarket applications at this

1     point.

2               THE COURT:  Okay.  All right.

3               MR. BECKENHAUER:  Thank you, Your Honor.

4               THE COURT:  Thank you.  I ask this question

5     reluctantly, but I promised you that I would:  Mr. Block, I

6     didn't let you say anything introductory, but are there any

7     points that you didn't get to make with respect to any of

8     these issues that you think I need to hear?

9               MR. BLOCK:  No, Your Honor.  We're grateful for

10    your time and your attention to this important case.  This

11    is an existential issue for the vaping industry.  It raises

12    a very serious question about the role of the Court and the

13    Court's judicial review of agency action.  It implicates

14    issues of agencies reaching beyond their statutory authority

15    and engaging in arbitrary and capricious rulemaking, and in

16    contravening the First Amendment.

17              We respectfully request that this Court vacate the

18    deeming rule as applied to the vaping products.

19              THE COURT:  All right.  Think you.

20              Is there anything further that other plaintiffs'

21    counsel wants to add?  Any issue that you feel like you

22    didn't get to highlight that you want to highlight?

23              MR. GOTTING:  Thank you.  I'd just like to respond

24    just briefly to his comment.  I don't want the Court to get

25    hooked on the long term.  Our point is that we have to do

1     something to satisfy the population effects standard.

2     What's our effect on initiation?  What is it on cessation?

3          Whatever you call it, they've admitted there's no

4     data out there to do it.  Their only response has always

5     been some day you'll be able to point to public records.  We

6     don't have that.  So whether it's long term, whether it's a

7     clinical study, whether it's an epidemiological study, which

8     is completely different, or whether it's something else, we

9     told them that we cannot do this in two years.  And they

10    were obligated under the APA to go through that analysis and

11    tell us why we can.  And if we can't, why it doesn't violate

12    the Tobacco Control Act.

13         THE COURT:  You mean why it doesn't violate the

14    APA.

15         MR. GOTTING:  Excuse me.  The APA.  Thank you for

16    your time.

17         THE COURT:  Thank you.  Any last remarks or any

18    issues you don't feel like -- questions that I didn't get to

19    ask you that you wanted to answer?

20         MR. BECKENHAUER:  Just two quick points, Your

21    Honor.  I'm informed by FDA that it is correct that the

22    agency's premarket application guidance does not necessarily

23    require longitudinal clinical trials.  And just --

24         THE COURT:  There is some population health

25    effects that is required.

1          MR. BECKENHAUER:  Absolutely.  But again, that's

2     baked into the statute.  The statute requires the agency to

3     take -- to look at the effect of these products on usage

4     rates among current users of tobacco products and, of course,

5     among the potential for uptake or initiation among current

6     nonusers.  But again, that's part and parcel of this statute.

7          And so my final point is just that in the Tobacco

8     Control Act Congress was acting in the light of experience

9     that it's gained over decades of combatting tobacco-related

10    disease.  And in the Act it firmly placed the burden on the

11    manufacturers to show that these supposedly healthier

12    devices are in fact appropriate for the protection of the

13    public health, not on the FDA to demonstrate otherwise.

14          THE COURT:  All right.

15          MR. BECKENHAUER:  Thank you, very much.

16          THE COURT:  Thank you, everyone.  I appreciate

17    your patience and your putting up with the structure of

18    today's argument.  But I think it would have been very

19    difficult for me to understand each side's arguments and for

20    the government to respond to plaintiffs' arguments if we had

21    done your entire argument first and then heard theirs.  So I

22    fell it went well, for me.  I don't know how you feel about it.

23          But at any rate, I now have it under advisement.

24    I thank everybody for the quality of their arguments this

25    morning.

                              *   *   *

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3         I, JANICE DICKMAN, do hereby certify that the above

4    and foregoing constitutes a true and accurate transcript of

5    my stenograph notes and is a full, true and complete

6    transcript of the proceedings to the best of my ability.

7                   Dated this 13th day of October, 2016.

8

9

10                   /s/_____

11                   Janice E. Dickman, CRR, RMR
                     Official Court Reporter
12                   Room 6523
                     333 Constitution Avenue NW
13                   Washington, D.C. 20001

14

15

16

17

18

19

20

21

22

23

24

25